Kimberly Parmenter PRICE, Petitioner,

v.

Duane PRICE, Respondent.

No. C–5958.

Supreme Court of Texas.

June 24, 1987.

Marvin B. Zimmerman and Gail Kay Zimmerman, Law Offices of Marvin B. Zimmerman, San Antonio, for petitioner.

Timothy Patton, Groce, Locke & Hebdon, San Antonio, for respondent.

KILGARLIN, Justice.

This case presents us with the opportunity to re-examine the validity of the doctrine of interspousal immunity. The case originated as a civil action of negligence for personal injuries brought by Kimberly Parmenter Price against her husband, Duane Price. Duane Price's motion for summary judgment was granted. The court of appeals affirmed that judgment. 718 S.W.2d 65. We reverse the judgment of the court of appeals and remand this cause to the trial court.

In July of 1983, Kimberly Parmenter, at the time a feme sole, was injured when a motorcycle on which she was riding collided with a truck. The motorcycle was driven by Duane Price. Six months after the accident, Duane and Kimberly were married. After marriage, Kimberly brought this action seeking recovery from her husband, Duane, and from the driver of the truck, claiming that the negligence of these drivers had caused her injuries. The driver of the truck and his employer settled. The trial court, in granting summary judgment for Duane, relied on the doctrine that one spouse could not sue another for negligent conduct.

The doctrine of interspousal immunity is a part of the common law, having been judicially created. Its origins are shrouded in antiquity, but the basis of the doctrine is *"that a husband and wife are one person." Firebrass v. Pennant,* 2 Wils. 255, 256 (C.P. 1764) (emphasis in original).

A woman's disability during coverture was an essential ingredient in fostering the doctrine. As was stated in *Thompson v. Thompson,* 218 U.S. 611, 614–15, 31 S.Ct. 111, 54 L.Ed. 1180 (1910):

> At common law the husband and wife were regarded as one,—the legal existence of the wife during coverture being merged in that of the husband; and, generally speaking, the wife was incapable of making contracts, of acquiring property or disposing of the same without her husband's consent. They could not enter into contracts with each other, *nor were they liable for torts committed by one against the other* (emphasis added).

An earlier thesis on American law expanded the concept of superiority of the husband over the wife even to the extent of restraining her liberty or disciplining her.

2 Kent's Com. 174 (8th ed. 1854). While in this, the last quarter of the twentieth century, such views seem preposterous, recognition that those views were prevalent in the law makes easily understandable why suits by wives against husbands were not permitted.

However, the husband/wife unity argument as grounds for the doctrine was severely impeded by the adoption of what were known as Married Women Acts. These legislative acts occurred principally in the latter half of the nineteenth century and early twentieth century. *See, e.g.,* 1877 Conn.Pub.Acts c. 114; Ga.Code Ann. § 7142 (1913); 1949 Kan.Sess.Laws 23–20 (1868); Mass.Gen.L. ch. 209 §§ 1–13 (1845); Mo.Rev.Stat. §§ 1735 & 8304 (1909); Mont. Code Ann. §§ 1439–1441 (1887); 1893 Pa. Laws 345 § 3; and 1913 Tex.Gen.Laws ch. 32, p. 61. These acts, while varying from state to state, generally gave wives the rights to own, acquire and dispose of property; to contract; and, to sue in respect to their property and contracts. Most importantly, many of the statutes specifically abolished the doctrine of the oneness of husband and wife.

With the demise of the legal fiction of the merger of husband and wife into a single entity, the doctrine of interspousal immunity found support in considerations of marital harmony, as well as the potential for collusive lawsuits. Restatement (Second) of Torts § 895F, comment d (1979).

American jurisdictions, in upholding the doctrine, early on espoused the premise that a civil suit by one spouse against another would destroy the harmony of the home. One court, in a fire and brimstone opinion upholding the prohibition against suits between spouses, foresaw all manner of evil should the immunity doctrine be terminated. In *Ritter v. Ritter,* 31 Pa. 396 (1858), that court, while observing that a favorite maxim at common law was that marriage makes a man and woman one person at law, also said:

> Nothing could so complete that severance [of the marriage relationship] and degradation, as to throw open litigation to the parties. The maddest advocate for

woman's rights, and for the abolition on earth of all divine institutions, could wish for no more decisive blow from the courts than this. The flames which litigation would kindle on the domestic hearth would consume in an instant the conjugal bond, and bring on a new era indeed—an era of universal discord, of unchastity, of bastardy, of dissoluteness, of violence, cruelty, and murders.

The second argument for barring interspousal suits, the possibility of collusive lawsuits, is entirely inconsistent with the subjugation of wife to husband and preservation of happy homes theses. Nevertheless, such inconsistency did not seem to trouble the courts. The possibility of collusion was alluded to in *Abbott v. Abbott,* 67 Me. 304 (1877), where it was suggested that a widow could raid her deceased husband's estate by claiming all sorts of wrongs by him during his lifetime. The fraud theory expanded into vogue with the advent of insurance to cover vehicular accidents. In *Newton v. Weber,* 119 Misc.Rep. 240, 196 N.Y.S. 113, 114 (1922), the court said of allowing a tort action by a wife against her husband, "[t]he maintenance of an action of this character, unless the sole purpose be a raid upon an insurance company, would not add to conjugal happiness and unison."

Without ascribing any reasons for doing so, Texas adopted the doctrine of interspousal immunity one hundred years ago in *Nickerson and Matson v. Nickerson,* 65 Tex. 281 (1886), citing as authority only *Cooley on Torts, Peters v. Peters,* 42 Iowa 182 (1875), and *Langendyke v. Langendyke,* 44 Barb. 366 (N.Y.1863). *Nickerson* barred all civil actions for tort between husband and wife.

Neither Cooley nor either case relied upon offered logic for the doctrine. Those authorities merely stated that the law forbade suits by one spouse against the other for personal injuries.

The doctrine remained firmly established as Texas law until *Bounds v. Caudle,* 560 S.W.2d 925 (Tex.1977). *Bounds* abrogated the rule as to intentional torts. In *Bounds,* this court concluded that suits for willful or

intentional torts would not disrupt domestic tranquility since "the peace and harmony of a home" which had "been strained to the point where an intentional physical attack could take place" could not be further impaired by allowing a suit to recover damages. *Id.* at 927.

Is there today any policy justification for retaining this feudal concept of the rights of parties to a marriage? Apparently, our colleagues on the Court of Criminal Appeals have decided "no" in respect to the marital discord argument. With their September 1, 1986 promulgation of Tex.R. Crim.Ev. 504, that court abolished the longstanding rule that one spouse could prevent the other from voluntarily giving testimony in a criminal prosecution. The Fourth Court of Appeals also questioned the justification of the policy when it observed:

[W]hile the new legislation [the Married Women Acts] forced recognition of the rights of a married woman to recover from her husband if he broke the leg of her mule, the courts continued to clothe him with immunity if he tortiously broke his wife's leg.

\* \* \* \* \* \*

It has never been satisfactorily explained how permitting the wife to recover for her husband's conduct which tortiously injures her property would not disrupt domestic harmony, while allowing her to recover for bodily injury would.

*Sneed v. Sneed,* 705 S.W.2d 392, 394 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.).

It was likewise that court, in upholding the summary judgment in this case, that said:

Although neither courts nor commentators have satisfactorily explained how denying relief to the injured spouse will promote harmony, we are constrained to follow the unambiguous, if indefensible, precedent set by *Nickerson* and *Bounds.*

718 S.W.2d at 66.

Dean William Prosser, a preeminent commentator on tort law, certainly agreed that the doctrine is indefensible. He has stated:

Stress has been laid upon the danger of fictitious and fraudulent claims, on the very dubious assumption that a wife's love for her husband is such that she is more likely to bring a false suit against him than a genuine one; and likewise the possibility of trivial actions for minor annoyances, which might well be taken care of by finding consent to all ordinary fictions of wedlock—or at least assumption of risk! The chief reason relied upon by all these courts, however, is that personal tort actions between husband and wife would disrupt and destroy the peace and harmony of the home, which is against the policy of the law. This is on the bald theory that after a husband has beaten his wife, there is a state of peace and harmony left to be disturbed; and that if she is sufficiently injured or angry to sue him for it, she will be soothed and deterred from reprisals by denying her the legal remedy—and this even though she has left him or divorced him for that very ground, and although the same courts refuse to find any disruption of domestic tranquility if she sues him for a tort to her property, or brings a criminal prosecution against him. If this reasoning appeals to the reader, let him by all means adopt it.

Prosser, *Law of Torts,* § 122 at 863 (4th ed. 1971). While it is true that part of this quote involves intentional rather than negligent torts, the arguments in favor of interspousal immunity are generally equally applicable, and lacking, as to both. It is difficult to fathom how denying a forum for the redress of any wrong could be said to encourage domestic tranquility. It is equally difficult to see how suits based in tort would destroy domestic tranquility, while property and contract actions do not.

As to the potential for fraud and collusion, we are unable to distinguish interspousal suits from other actions for personal injury. In *Whitworth v. Bynum,* 699 S.W.2d 194, 197 (Tex.1985), this court "refuse[d] to indulge in the assumption that close relatives will prevaricate so as to promote a spurious lawsuit." Our system of justice is capable of ascertaining the existence of fraud and collusion. The Su-

preme Court of West Virginia, abolishing the rule in *Coffindaffer v. Coffindaffer,* 161 W.Va. 557, 244 S.E.2d 338, 343 (1978), stated:

> Anyone who has confronted insurance defense counsel in personal injury cases knows that it is a rare occasion when the false or collusive claim escapes their searching examination. We do an injustice not only to the intelligence of jurors, but to the efficacy of the adversary system, when we express undue concern over the quantum of collusive or meritless lawsuits. There is, to be sure, a difference between the ability to file a suit and to achieve a successful result. It is upon the anvil of litigation that the merit of a case is finally determined. Forged in the heat of trial, few but the meritorious survive.

In regards to both the domestic tranquility and fraud arguments, Prosser and Dean Page Keeton have said "almost no legal writer has had any use for these arguments, and under repeated criticisms and reiterated attacks on them in the courts, judicial perception of these arguments has slowly shifted." W. Prosser & P. Keeton, *Law of Torts* § 122 at 902 (5th ed. 1984).

Other jurisdictions have preceded us in either completely or partially abolishing the doctrine of interspousal immunity. *See Penton v. Penton,* 223 Ala. 282, 135 So. 481 (1931); *Cramer v. Cramer,* 379 P.2d 95 (Alaska 1963); *Fernandez v. Romo,* 132 Ariz. 447, 646 P.2d 878 (1982) (rule abrogated for vehicular torts); *Leach v. Leach,* 227 Ark. 599, 300 S.W.2d 15 (1957); *Klein v. Klein,* 58 Cal.2d 692, 26 Cal.Rptr. 102, 376 P.2d 70 (1962); *Rains v. Rains,* 97 Colo. 19, 46 P.2d 740 (1935); *Brown v. Brown,* 88 Conn. 42, 89 A. 889 (1914); *Rogers v. Yellowstone Park Co.,* 97 Idaho 14, 539 P.2d 566 (1975) (rule abrogated as to vehicular torts); *Brooks v. Robinson,* 259 Ind. 16, 284 N.E.2d 794 (1972); *Shook v. Crabb,* 281 N.W.2d 616 (Iowa 1979); *Brown v. Gosser,* 262 S.W.2d 480 (Ky.1953); *MacDonald v. MacDonald,* 412 A.2d 71 (Me.1980); *Boblitz v. Boblitz,* 296 Md. 242, 462 A.2d 506 (1983) (rule abrogated as to vehicular torts); *Brown v. Brown,* 381 Mass. 231, 409 N.E.2d 717 (1980); *Hosko v. Hosko,* 385 Mich. 39, 187 N.W.2d 236 (1971); *Beadette v. Frana,* 285 Minn. 366, 173 N.W.2d 416 (1963); *S.A.V. v. K.G.V.,* 708 S.W.2d 651 (Mo.1986); *Imig v. March,* 203 Neb. 537, 279 N.W.2d 382 (1979); *Rupert v. Stienne,* 90 Nev. 397, 528 P.2d 1013 (1974) (rule abrogated as to vehicular torts); *Gilman v. Gilman,* 78 N.H. 4, 95 A. 657 (1915); *Merenoff v. Merenoff,* 76 N.J. 535, 388 A.2d 951 (1978); *Maestas v. Overton,* 87 N.M. 213, 531 P.2d 947 (1975); *State Farm Mutual Automobile Insurance Co. v. Westlake,* 35 N.Y.2d 587, 364 N.Y.S.2d 482, 324 N.E.2d 137 (1974); *Crowell v. Crowell,* 180 N.C. 516, 105 S.E. 206 (1920); *Fitzmaurice v. Fitzmaurice,* 62 N.D. 191, 242 N.W. 526 (1932); *Shearer v. Shearer,* 18 Ohio St.3d 94, 480 N.E.2d 388 (1985); *Courtney v. Courtney,* 184 Okl. 395, 87 P.2d 660 (1938); *Hack v. Hack,* 495 Pa. 300, 433 A.2d 859 (1981); *Digby v. Digby,* 120 R.I. 299, 388 A.2d 1 (1978) (rule abrogated as to vehicular torts); *Prosser v. Prosser,* 114 S.C. 45, 102 S.E. 787 (1920); *Scotvold v. Scotvold,* 68 S.D. 53, 298 N.W. 266 (1941); *Davis v. Davis,* 657 S.W.2d 753 (Tenn.1983); *Stoker v. Stoker,* 616 P.2d 590 (Utah 1980); *Richard v. Richard,* 131 Vt. 98, 300 A.2d 637 (1973) (rule abrogated as to vehicular torts); *Suarratt v. Thompson,* 212 Va. 191, 183 S.E.2d 200 (1971) (rule abrogated as to vehicular torts); *Freehe v. Freehe,* 81 Wash.2d 183, 500 P.2d 771 (1972); *Coffindaffer v. Coffindaffer,* 161 W.Va. 557, 244 S.E.2d 338 (1978); *Wait v. Pierce,* 191 Wis. 202, 209 N.W. 475 (1926).

The doctrine of interspousal immunity has previously been abrogated as to some causes of action in this jurisdiction. We now abolish that doctrine completely as to any cause of action. We do not limit our holding to suits involving vehicular accidents only, as has been done by some jurisdictions and as has been urged upon us in this case. To do so would be to negate meritorious claims such as was presented in *Stafford v. Stafford,* 726 S.W.2d 14 (Tex. 1987). In that case a husband had transmitted a venereal disease to his wife, resulting in an infection that ultimately caused Mrs. Stafford the loss of her ovaries and fallopian tubes, ending for all time

her ability to bear children. While we ruled for her, the issue of interspousal immunity had not been preserved for our review. To leave in place a bar to suits like that of Mrs. Stafford or other suits involving non-vehicular torts would amount to a repudiation of the constitutional guarantee of equal protection of the laws. Tex. Const. Ann. art. I, § 3. This we will not do.

Our result today is compelled by the fundamental proposition of public policy that the courts should afford redress for a wrong, and the failure of the rationale supporting the doctrine to withstand scrutiny. We therefore reverse the judgment of the court of appeals upholding the trial court's summary judgment, and remand this cause to the trial court for further proceedings.

MAUZY, J., concurs with an opinion.

MAUZY, Justice, concurring.

Although I concur whole-heartedly in the opinion of the court, I am compelled to voice my outrage at the recent action of our State Board of Insurance. With its opinion today, the court has rid Texas common-law of an archaic doctrine. Yet, the State Board of Insurance has now incorporated this same senseless doctrine into contract law. It recently prescribed a standard auto policy endorsement that expressly excludes liability coverage for intrafamily suits. 12 TEX.REG. 1126 (1987) (Form 575 adopted as part of amendments to *Rules and Rates Governing the Insuring of Automobiles and Standard Endorsements*). The Board's action cannot have any rational justification; and it does not in any way serve the interests of the people of Texas.