J.H. SCHLUETER and Richard Stephen
Schlueter, Appellants,

v.

Karen Sue SCHLUETER, Appellee.

No. 03–95–00294–CV.

Court of Appeals of Texas,
Austin.

Aug. 28, 1996.

John L. Foster, Minton, Burton, Foster & Collins, P.C., Austin, for J. H. Schlueter.

Philip C. Friday, Jr., Austin, for Richard Stephen Schlueter.

John F. Campbell, Campbell & Morgan, P.C., Austin, for Appellee.

Before CARROLL, C.J., and ABOUSSIE and KIDD, JJ.

CARROLL, Chief Justice.

This is an appeal by appellant Richard Schlueter from a divorce action he filed against appellee Karen Schlueter as well as an appeal by appellant Hudson Schlueter who was joined in a third party action brought by Karen for conspiracy and fraud. Judgment was granted on a jury verdict against Richard and Hudson for actual and punitive damages. The court awarded $12,850 to the community estate for the fraud against the community to be assessed against Richard and Hudson, jointly and severally. The court also granted judgment to Karen for punitive damages in the amount of $30,000 against Richard and $15,000 against

Hudson. Richard appeals in seven points of error; Hudson appeals in a single point of error. We will affirm the judgment of the trial court.

## BACKGROUND

Richard and Karen Schlueter were married on June 7, 1969, and had two children. For most of the marriage, Richard worked for IBM and, at the time of his retirement, was earning $42,000 per year. Karen was employed by the state and earned around $29,000 per year.

In December 1992, Richard and a co-worker, Charlie King, agreed to invest as equal partners in emus. Richard and King each paid $2,750 towards the first pair of emus. Then, after agreeing to purchase a second pair of birds for $3,600, Richard and King each paid $500 as a down payment. Richard testified that, because of the probable expenses and possible losses involved, he decided that he could not be involved in the business due to his impending retirement from IBM. So, after investing at least $3,250 in the emus and without receiving any profits from the business, Richard decided on May 3, 1983 to sell his interest in the business to Hudson for $1000.

Although Karen knew that Richard had invested in emus, she did not know the details. In fact, Karen did not discover that Richard had sold his interest in the emus to Hudson until after Richard filed for divorce. Testimony indicated that the emu business, which Richard sold to Hudson for $1,000 shortly before he filed for divorce, was worth at least $10,000.

Then, as a result of IBM's downsizing, Richard agreed to accept an incentive bonus in exchange for his early retirement. Richard received an incentive check from IBM of $30,360.41 on May 28, 1993, his last day of work. At Richard's request, Hudson picked up the check from Richard while he was still at work and deposited it in his own account.

When Richard returned home after his last day of work, Karen told him that she wanted a divorce. Richard and Karen's marriage had serious problems over a period of a couple of years, and according to Karen, they

had grown apart. In fact, one night in April 1993, while engaged in sexual intercourse, Richard asked Karen if she loved him and she answered no. Richard testified that many people have problems and that he believes that his marriage "healed" after this incident and "kept going for a long time." That night, Richard went to his parents' house and, according to Richard, told them for the first time about the couple's problems and the impending divorce. Although claiming to be shocked when Karen gave him the news, Richard was the one who actually filed for divorce on June 24, 1993.

Richard told Hudson to hold the IBM incentive check in his own account, until he "figured out what was going to happen here." Then, on June 17, 1993, one week before Richard filed for divorce, Hudson wrote himself a check from the account in the amount of $12,565. Richard and Hudson testified that this amount represented money borrowed by Richard over the last thirty years, both before and after his marriage to Karen. Hudson testified that he kept a log book in which he recorded most of the financial transactions that he had with his four children, including Richard. In conjunction with the book, Hudson had notes signed by Richard representing all of the individual debts recorded in the log book. In their deposition testimony, Richard, Hudson, and Richard's mother, Betty, agreed that each of these notes was created and signed by Richard at the actual time he borrowed money from his parents. At trial, however, all three changed their testimony to indicate that, on the advice of an estate planning attorney, Hudson created the notes in the late seventies to provide evidence of the debts in addition to the log book.

Karen testified to having no knowledge of any unpaid debts that she or Richard owed to Hudson or Betty. In fact, on several occasions, Richard bragged that he was very proud of the fact that he was the only one of four children who did not owe his father any money. Richard, however, attempts to clarify this in his testimony, claiming that what he actually meant was that he and Karen had paid back all of the obligations that they had borrowed for *specific* purposes during their

marriage and that he only owed Hudson money that he had borrowed years before.

Evidence at trial showed that, in 1984, a divorce action was filed against Hudson's oldest son, John. At the end of the trial, John was ordered to pay an attorney ad litem who represented John's children in this action. The court found that John transferred some property to Hudson in an attempt to avoid paying the attorney ad litem. The court further found that Hudson had notice of his son John's intent to delay or defraud the attorney ad litem in the collection of her fee.

In this case, Richard filed for divorce on June 24, 1993. Karen answered the action and filed a counterclaim seeking appointment as managing conservator of the children, reimbursement to the community estate of assets expended on behalf of Richard's separate estate, and attorneys' fees. Karen also brought a tort action and a third-party claim against Richard and Hudson, alleging that they were guilty of fraud, breach of fiduciary duty, and conspiracy.

### DISCUSSION

Appellant Hudson Schlueter, in his sole point of error, and appellant Richard Schlueter, in his first point of error, contend that the trial court erred in admitting evidence concerning Hudson Schlueter's "other acts" during his son John's 1984 divorce in violation of the Texas Rules of Civil Evidence. Specifically, Hudson and Richard objected on three grounds: (1) the evidence was irrelevant; (2) the probative value of this evidence was substantially outweighed by the danger of unfair prejudice and misleading of the jury; and (3) the evidence was not properly admitted under any exception to Rule 404(b) of the Texas Rules of Civil Evidence. The trial court overruled appellants' objections and allowed them a running objection to all such evidence. Further, as requested, the trial court instructed the jury that this evidence was only applicable to Hudson and should not be considered against Richard.

■ In order to obtain a reversal of a judgment based upon error of the trial court in admission or exclusion of evidence, an appellant must show: (1) that the trial court did in fact commit error; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). The admission or exclusion of evidence rests with the sound discretion of the trial court. *New Braunfels Factory Outlet v. IHOP*, 872 S.W.2d 303, 310 (Tex.App.—Austin 1994, no writ). The trial court commits error only when it acts in an unreasonable and arbitrary manner, or acts without reference to any guiding principles. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex.1991).

■ Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R. Civ. Evid. 401. All relevant evidence is admissible unless it is shown that the evidence should be excluded for some other reason. Tex.R. Civ. Evid. 402. In this case, the question is whether the evidence that Hudson aided his son, John, in an illegal act during John's 1984 divorce would make it more or less probable that Hudson would participate with his other son, Richard, in fraudulent behavior during Richard's divorce. On both occasions, Hudson was involved with his sons who were each going through a divorce and engaged in actions which apparently served to benefit them financially. There is a direct and logical connection between Hudson's 1984 actions and his alleged fraudulent behavior in this case which serves to make Hudson's alleged acts more probable. Thus, the contested evidence is clearly relevant. *See Service Lloyds Ins. Co. v. Martin*, 855 S.W.2d 816, 822 (Tex.App.1993).

■ Evidence of other wrongs or acts is generally not admissible to prove the character of a person to show that he acted in conformity with that character on a particular occasion. Tex.R. Civ. Evid. 404(b). Such evidence may be admissible, however, to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* Karen concedes that evidence of Hudson's 1984 actions cannot be used to show that he acted in conformity with those actions. She does,

however, urge that such evidence would be admissible under a Rule 404(b) exception.

The evidence shows that Hudson paid Richard $1,000 for the emu business which had supposedly become a financial problem for Richard. This is despite the fact that Richard had already invested $3,250 into the business and that Charles King, Richard's partner, claimed the business to be worth at least $10,000. Then, shortly after helping Richard with his financial problem, Hudson took possession of Richard's $30,360.41 IBM incentive check and wrote himself a check for $12,565, allegedly repaying money that Richard had borrowed over the last thirty years. Further, to verify these debts, Hudson produced some notes on various scraps of paper signed by Richard and dating back to the sixties. In their deposition testimony, Hudson, Betty, and Richard indicated that Richard had signed each of these notes at the time he borrowed the money. At trial, when faced with the testimony of Karen's forensic documents examiner, all three of them changed their testimony to indicate that Richard actually signed the notes in the late seventies at the suggestion of Hudson's estate planning attorney. Based on this evidence, we agree that the evidence of Hudson's 1984 actions was admissible in this case if nothing more than to show his motive and intent to assist his children, whether legally or illegally, as they struggled through the financially draining process of divorce. *See* Tex.R. Civ. Evid. 404(b); *Porter v. Nemir*, 900 S.W.2d 376, 381 (Tex.App.—Austin 1995, no writ).

Hudson contends that, even if his 1984 actions were relevant, the trial court erroneously introduced them into evidence because the probative value of this evidence was substantially outweighed by the danger of unfair prejudice and misleading the jury. *See* Tex.R. Civ. Evid. 403. Hudson relies on a four-part balancing test set forth in a criminal case, *Montgomery v. State*, 810 S.W.2d 372, 392–93 (Tex.Crim.App.1990), and applied to civil cases by *McLellan v. Benson*, 877 S.W.2d 454 (Tex.App.—Houston [1st Dist.] 1994, no writ), to claim that the trial court committed reversible error when it allowed

Hudson to be questioned regarding his son John's 1984 divorce.

This Court has declined to adopt the *Montgomery* test in civil cases as suggested by *McLellan*. *See Porter*, 900 S.W.2d at 381 n. 6. Further, we have noted that "[b]ecause of the severe consequences of applying Rule 403—the exclusion of relevant evidence—the application of the rule 'is an extraordinary remedy that must be used sparingly.'" *Trevino v. Department of Protective & Regulatory Servs.*, 893 S.W.2d 243, 248 (Tex.App.—Austin 1995, no writ) (quoting *LSR Joint Venture No. 2 v. Callewart*, 837 S.W.2d 693, 698 (Tex.App.—Dallas 1992, writ denied)). Little evidence in a lawsuit will not be prejudicial to at least one party. *Porter*, 900 S.W.2d at 381.

■ In weighing the prejudice, we must first examine the necessity for and probative effect of the evidence. *Trevino*, 893 S.W.2d at 249. Both sides agree that the ultimate issue for which the evidence was offered was whether Hudson conspired with his son Richard to defraud Karen and the community estate. As stated above, other evidence presented at trial shows Hudson to be engaging in conduct detrimental to the community estate.

Hudson's actions were taken at a time when Richard and Karen were having marital difficulties and could certainly indicate a motive and intent on Hudson's part to defraud Karen and the community estate. Hudson's 1984 actions help to clarify Hudson's motive and intent in this case. It is unlikely that the introduction of this evidence caused the jury to lose sight of the specific issues they were called upon to decide. *See Porter*, 900 S.W.2d at 382. Accordingly, the trial court did not abuse its discretion in determining that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence.

■ Richard adopts Hudson's arguments as his own and further contends that, because he was not involved in the 1984 transaction in any way, the court's limiting instructions did not cure the error. Richard argues that, if the 1984 judgment made it more probable that Hudson acted fraudulent-

ly, it necessarily made it more probable that Richard acted fraudulently. We disagree.

The disputed evidence clearly went to the issue of Hudson's motive and intent. Before the jury heard the evidence, the court directly and adequately instructed the jury to consider this evidence only as it applied to Hudson and to not hold it against Richard. We believe the instruction was effective in neutralizing any danger of unfair prejudice. *McLellan,* 877 S.W.2d at 459. Because we do not find that the trial court committed error in admitting the evidence in question, we overrule Richard's first point of error as well as Hudson's sole point of error.

■ In his second point of error, Richard argues that the trial court erred in granting judgment to Karen for $30,000 in exemplary damages against Richard because Karen failed to submit a jury issue on whether Richard had acted intentionally or maliciously in committing fraud against Karen. Richard did not object at trial to the court's failure to submit this jury issue, and he raises this point for the first time on appeal. Any error in failing to submit a question was waived. *See* Tex.R.App. P. 52(a); *Rodgers v. RAB Invs., Ltd.,* 816 S.W.2d 543, 551 (Tex. App.—Dallas 1991, no writ). "Furthermore, when one or more of the elements of a ground of recovery are submitted to the jury, and one or more of the elements are omitted, a failure to object to the omission waives the complaint." *Rodgers,* 816 S.W.2d at 551 (citing Tex.R. Civ. P. 279). Some evidence exists to support the omitted issue, and thus it is deemed found by the court in support of the judgment. *Id.* We overrule Richard's second point of error.

■ In his third point of error, Richard asserts that the trial court erred in awarding $30,000 to Karen in exemplary damages based upon Richard's fraud because fraud is not a separate cause of action in a divorce case which will support a personal judgment in favor of the other spouse. Richard argues that, because both the judgment and the verdict in this case were in Karen's favor and the trial court did not include the award as part of the division of the parties' assets and liabilities, the $30,000 exemplary damage judgment is fatally flawed and must fail.

Specifically, Richard relies on *Belz v. Belz,* 667 S.W.2d 240 (Tex.App.—Dallas 1984, ref'd n.r.e.). In *Belz,* the husband filed for divorce, and the wife, in addition to her cross action for divorce, alleged fraud on her community interest in the marital estate and sought actual and exemplary damages. *Id.* at 242. The husband's fraud on the wife's community interest was tried as a separate cause of action, and the wife received both actual and exemplary damages. In reversing the judgment of the trial court, however, the Dallas Court of Appeals held that:

> the trial court's submission of the issue of [the husband's] fraud on [the wife's] community interest as a separate common law action in tort for fraud was erroneous, and that in actuality [the wife] had only a claim for the value of her interest in the community property wrongfully displaced by [the husband]. The basis for this claim is [the husband's] fraud on the community which may be asserted, in the context of a divorce and property division, for the trial court's consideration in the division of the estate of the parties.

*Id.* at 246. In other words, a claim of fraud on the community is a means of obtaining "a greater share of the community estate upon divorce, in order to compensate the wronged spouse for his or her lost interest in the community estate." Thus, according to the Dallas court, the wife has a right to recover the value of her community interest in the property which the trier of fact finds to be depleted wrongfully from the estate, but only in conjunction with the property division. *Id.* at 247.

The supreme court in 1977 abolished the doctrine of interspousal immunity to the extent that it would bar all claims between spouses for wilful and intentional torts. *Bounds v. Caudle,* 560 S.W.2d 925, 927 (Tex. 1977). Then, in 1987, after *Belz* was decided, the supreme court abolished the doctrine completely *as to any cause of action,* including negligence claims. *Price v. Price,* 732 S.W.2d 316, 319 (Tex.1987). "Under the rules established in *Caudle* and *Price,* there appears to be no legal impediment to bringing a tort claim in a divorce action based on

either negligence or an intentional act such as assault and battery." *Twyman v. Twyman,* 855 S.W.2d 619, 624 (Tex.1993).

Admitting that fraud is an intentional tort, the *Belz* court attempted to distinguish its holding from the supreme court's holding in *Bounds* as well as from the San Antonio Court of Appeals' decision in *Mogford v. Mogford,* 616 S.W.2d 936, 940 (Tex.Civ. App.—San Antonio 1981, writ ref'd n.r.e.), which held that a trial court could properly render judgment, as part of the divorce proceedings, against a spouse for injuries resulting from willful and intentional torts committed upon the spouse during marriage. In *Belz,* the court noted that both *Bounds* and *Mogford* involved actions for personal injuries to the spouse resulting from intentional torts and that recovery by a spouse for personal injuries is characterized as separate property. *Belz,* 667 S.W.2d at 246. Because the fraud in *Belz* was not perpetrated upon the wife to the detriment of her separate estate but rather on her interest in the community estate, the court held that a judgment for fraud on the community is not one that could stand alone in the absence of a property division. *Id.* at 247; *see also In re Marriage of Moore,* 890 S.W.2d 821, 829 (Tex. App.—Amarillo 1994, no writ) (agreeing with *Belz* that no independent cause of action for fraud on the community, with separate damages, may be brought in a divorce action).

■ The court in *Twyman,* however, stated that joinder of tort claims with the divorce was encouraged when feasible because "[r]esolving both the tort and divorce actions in the same proceeding avoids two trials based at least in part on the same facts, and settles in one suit 'all matters existing between the parties.'" *Twyman,* 855 S.W.2d at 625 (quoting *Mogford,* 616 S.W.2d at 940). The supreme court's language in *Bounds* and then later in *Price* and *Twyman* is direct and unambiguous. The doctrine of interspousal immunity was abolished so as to allow a spouse to bring any cause of action against his or her spouse.

In *Belz,* the Dallas Court of Appeals attempts to create an exception to *Bounds,* thus breathing new life into an abolished doctrine. Because we believe that it is our duty to follow the decisions of the Texas Supreme Court, we decline to follow the rationale of the *Belz* court. *See Bruno v. Bruno,* 589 S.W.2d 179, 180 (Tex.Civ.App.—Waco 1979, writ ref'd n.r.e.) (citing *Swilley v. McCain,* 374 S.W.2d 871, 875 (Tex.1964)). The supreme court clearly abolished the doctrine of interspousal immunity and is certainly capable, without our assistance, of reviving that doctrine, in whole or in part, if it should ever feel the need. Accordingly, we overrule Richard's third point of error.

■ In his points of error four, five, and six, Richard contends that the trial court erred in failing to include all the money judgments against Richard and Hudson as community assets and community liabilities and in making a grossly disproportionate division of property which amounted to an abuse of discretion. We disagree.

■ The trial court acted properly in not including the two awards of exemplary damages in the community estate. *See In re Marriage of DeVine,* 869 S.W.2d 415, 429 (Tex.App.—Amarillo 1993, writ denied). The court in *Twyman,* however, warned that more difficult than deciding whether a tort claim may be brought in a divorce action is deciding when the tort claim must be brought and how the tort award should be considered when making a "just and right" division of the marital estate. *Twyman,* 855 S.W.2d at 624.

> When a tort action is tried with the divorce ... it is imperative that the court avoid awarding a double recovery.... Therefore, when a factfinder awards tort damages to a divorcing spouse, the court may not consider the same tortious acts when dividing the marital estate.... [A]n award for tortious conduct does not replace an analysis of the remaining factors to be considered when the trial court divides the marital estate. The court may still award a disproportionate division of property for reasons other than the tortious conduct. To avoid the potential problem of double recovery, the factfinder should consider the damages awarded in the tort action when dividing the parties' property.

*Id.* at 625 (citations omitted). Broad discretion is given to trial courts in making a just and right division of the community estate, and we will not disturb this discretion on appeal unless a clear abuse of discretion is shown. *Murff v. Murff,* 615 S.W.2d 696, 698 (Tex.1981). The test for abuse of discretion is whether the court acted without reference to any guiding rules and principles. *Capellen v. Capellen,* 888 S.W.2d 539, 543 (Tex. App.—El Paso 1994, writ denied). Further, it is presumed that the trial court exercised its discretion properly. *Murff,* 615 S.W.2d at 699.

As indicated in its findings of fact, the trial court considered many factors in making this division, including:

(1) Relative earning capacity of the parties;

(2) Attorneys' fees incurred and paid or owed to be paid by Karen at the time of trial;

(3) Future employability of the spouses;

(4) Earning power, business opportunities, capacities, and abilities of the spouses;

(5) Nature of the property involved in the division;

(6) Wasting of community property by the spouses;

(7) Creation of community property by the efforts of Karen; and

(8) Other matters ... relating to the wrong doing of Richard.

In light of these factors and the evidence in the record, we do not believe the court abused its discretion in awarding a disproportionate division of property to Karen along with the damages for Richard's and Hudson's tortious conduct. We overrule these points of error.

In his seventh point of error, Richard asserts that the trial court erred in awarding Karen attorneys' fees because the jury considered attorneys' fees in its award of damages for fraud. Richard argues that it is highly probable that this error resulted in a double recovery for Karen because her total attorneys' fees were $31,041.65, an amount almost identical to the jury's award of $30,000 in exemplary damages. Karen responds by claiming that the punitive damage amount is not a grant of attorneys' fees and that the expenditure of attorneys' fees was just one factor that was considered in arriving at the amount of an award of punitive damages.

As stated above, we agree that when a tort action is tried with a divorce action, it is imperative that the trial court avoid awarding a double recovery. *Twyman,* 855 S.W.2d at 625. A trial court's wide discretion, however, in making a just and right division of the community estate will not be disturbed on appeal without a clear abuse of discretion. *Murff,* 615 S.W.2d at 698. It is well established that a trial court in a divorce action can award attorneys' fees to either party as part of the property division based on the conditions and needs of the parties and all the surrounding circumstances. *Parker v. Parker,* 897 S.W.2d 918, 935 (Tex.App.—Fort Worth 1995, writ denied). Further, a trial court's award of attorneys' fees may include appellate attorneys' fees. *Siegler v. Williams,* 658 S.W.2d 236, 241 (Tex.App.—Houston [1st Dist.] 1983, no writ).

Based on the evidence in this case and the trial court's basis for awarding the various damages, we do not believe the trial court abused its discretion in awarding Karen attorneys' fees or that this award resulted in a double recovery for her. We overrule Richard's seventh point of error.

## CONCLUSION

We have overruled all of appellants' points of error in this case. Accordingly, we affirm the judgment of the trial court.