**TEXAS A & M UNIVERSITY,**
Appellant,

v.

**Paul A. BISHOP, Appellee.**

**No. 14-97-00153-CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

Jan. 7, 1999.

Rehearing Overruled May 20, 1999.

Laurie Rayson Eiserloh, Austin, for appellant.

Larry Boyd, Richard P. Hogan, Jr., Houston, for appellee.

Before Chief Justice MURPHY and Justices HUDSON and EDELMAN.

## MAJORITY OPINION

PAUL C. MURPHY, Chief Justice.

This appeal arises from a suit for personal injuries suffered by Paul A. Bishop while portraying "Vlad Dracula" in a play performed by the Texas A & M University at Galveston Drama Club. Texas A & M University (TAMU) challenges the judg-

ment in favor of Bishop in eleven points of error. We reverse and render judgment in favor of Texas A & M University.

In the Spring of 1994, the Drama Club of Texas A & M University at Galveston decided to perform the play, "Dracula," and a member of the club telephoned Michael Wonio, a local Galveston actor and director, who had directed previous Drama Club plays. Wonio agreed to direct the play. His wife, Diane Wonio, assisted with props and choreography of fight scenes. In one of the final scenes of the play, the character of Jonathan Harker impales Vlad Dracula with a knife. Diane Wonio prepared a stab pad for Bishop, as Vlad Dracula, to wear during this scene because the Wonios determined that the scene required use of a real knife. The stab pad was strapped to Bishop's chest with a target visible. Dennis Rittenhouse, another student, played the part of Jonathan Harker. On the night of the incident in question, Rittenhouse swung the knife, missed the stab pad, and stabbed Bishop in the chest.

Bishop was, at the time, unaware he had been stabbed. Continuing with his role, Bishop was lying in a closed coffin when he felt something wet trickling over his shoulder, and in the semi-darkness of the coffin interior, determined he was bleeding. Not realizing the extent of his injury, Bishop decided to rub some blood from his chest onto the knife. When he emerged from the coffin, Bishop brandished the bloody knife. As the scene continued, however, Bishop began feeling weak. The scene called for Vlad Dracula to die in the arms of his love, Mina the Maiden. Rather than whisper "good-bye" to Mina, Bishop whispered to her to call an ambulance. Mina dashed off-stage to call paramedics. Bishop cut the final scene short by giving a short ad-libbed soliloquy and quickly exiting the stage.

Bishop was taken by ambulance to a hospital emergency room, where it was determined that the knife had penetrated Bishop's lung, causing a pneumothorax, or collapsed lung. Bishop remained in the hospital for eight days. Bishop testified that his grade point average declined and he continues to experience weakness, insomnia, and nightmares.

Bishop filed this negligence suit against TAMU, Drama Club faculty advisors, Drs. Stephen Curley and Melanie Lesko, and the Wonios alleging negligence. The Wonios settled with Bishop before trial. The case was then tried to a jury only on claims of negligence against the Wonios and Drs. Curley and Lesko as employees of TAMU. The jury found the Wonios and the Drama Club faculty advisors acted as employees on the night in question and were negligent in the use of tangible personal property. The jury awarded Bishop $350,000 in damages. After an off-set for settlement credit, the trial court rendered judgment for $250,000.

■ In its first two points of error, TAMU asserts the trial court erred in overruling its motion for judgment notwithstanding the verdict and its motion for new trial because there was legally or factually insufficient evidence to support the jury's answer to question number one, regarding which individuals were TAMU's employees. Question one asked the jury if Mike and Diane Wonio, Stephen Curley, and Melanie Lesko, were acting as employees of the university on the occasion in question. The instructions for this question stated that an employee is not a volunteer, but is a person in the paid service of the university. The instruction further stated an employee is not an independent contractor or a person who performs tasks, the details of which the university does not have the legal right to control.

To determine whether the evidence is legally sufficient to support a jury's finding, the appellate court must consider only the evidence and inferences supporting the jury's verdict, disregarding all contrary evidence. *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). If there is more than a scintilla of evidence to support the find-

ing, a no evidence challenge must fail. *Id.* If there is any evidence of probative force to support the finding, we must overrule the point of error and uphold the jury's finding. *Southern States Transp., Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989); *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987), *overruled on other grounds, Price v. Price,* 732 S.W.2d 316 (Tex.1987). A scintilla of evidence exists when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

In deciding factual sufficiency questions, the appellate court must review all of the evidence. *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986). The court may set aside the finding only if the evidence is so weak as to be clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). Further, when reversing a trial court's judgment after concluding the supporting evidence is insufficient, the court of appeals must detail the relevant evidence introduced at trial and clearly state why the jury's finding is factually insufficient. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). The court should state in what regard the contrary evidence greatly outweighs the evidence supporting the jury's verdict. *Id.; Alm v. Aluminum Co. of America,* 717 S.W.2d 588 (Tex.1986).

 In Texas, a governmental unit is immune from tort liability unless the Legislature has waived immunity. *Dallas County Mental Health and Mental Retardation v. Bossley,* 968 S.W.2d 339, 341 (Tex.1998); *University of Texas Med. Branch v. York,* 871 S.W.2d 175, 177 (Tex. 1994). A state agency such as TAMU shares this governmental immunity. *Lowe v. Texas Tech University,* 540 S.W.2d 297, 298 (Tex.1976). The Texas Tort Claims Act provides for a limited waiver of governmental immunity under specified circumstances. *Id.;* TEX. CIV. PRAC. & REM.CODE ANN. § 101.021 (Vernon

1997). Under the act, a governmental unit may be held liable for personal injury caused by a condition or use of tangible personal property if the governmental unit would, were it a private person, be held liable under Texas law. *Id.* at (2). A governmental entity can be held liable for personal injuries only through the acts of its employees. *Dumas v. Muenster Hosp. Dist.,* 859 S.W.2d 648, 650 (Tex.App.-Fort Worth 1993, no writ). The Act defines "employee" as a "person, including an officer or agent, who is in the paid service of a governmental unit by competent authority, but does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control." TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(2) (Vernon Supp. 1998).

TAMU maintains that the definition of employee contains two parts: (1) the requirement that the person be in the paid service of the governmental unit, and (2) the requirement that the person not fall within the definition of "independent contractor." TAMU contends the evidence shows the Wonios were not in the paid service of TAMU, but instead were independent contractors.

 An independent contractor, unlike an employee, performs work according to his own methods and without being subject to the control of his employer, except as to the result of the work. *See Hoechst Celanese Corp. v. Compton,* 899 S.W.2d 215, 220 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (citing *Newspapers, Inc. v. Love,* 380 S.W.2d 582 (Tex. 1964)) If there is no contract or other evidence showing the employer has the right to control the details of the worker's performance, an employee-employer relationship may be established circumstantially by evidence of actual exercise of control. *See Anchor Cas. Co. v. Hartsfield,* 390 S.W.2d 469, 471 (Tex.1965); *INA v. Tor-*

*res,* 808 S.W.2d 291, 293 (Tex.App.-Houston [1st Dist.] 1991, no writ).

■ The courts generally analyze five factors in determining an alleged employer's right of control over the details of another's work: (1) the independent nature of the worker's business; (2) his obligation to furnish the necessary materials and supplies to perform the job; (3) his right to control the progress of the work except as to final results; (4) the time for which he is employed; and (5) whether he is paid by time or by the job. *See Hoechst Celanese,* 899 S.W.2d at 220; *INA,* 808 S.W.2d at 293.

The evidence showed Michael Wonio had directed three plays at TAMU. Michael's wife, Diane, had assisted with direction of these plays. The engagement to direct lasted approximately four to five weeks for rehearsal and the subsequent performances. For each of these plays, Wonio was paid $300 with a university check. Thus, the Wonios were paid by the job, and not by time. When Wonio was paid for the "Vlad Dracula" play, the letter enclosing the check praised Wonio "for the wonderful job you and your unpaid secret assistant Diane" did in directing the play. The Wonios' services were procured through an informal agreement made with a student member of the Drama Club.

The Wonios supplied some materials and props. Other materials were purchased with funds from the university. Dr. Curley testified the director was paid from a university account at a local bank set aside for student organizations. Based on this payment, Dr. Curley agreed that the Wonios were in the paid service of the university. William Charles Hearn, Dean of Student Life Affairs and Executive Associate Campus Dean, testified that this account was not the same account from which university employees are paid. Hearn further stated the university may not withdraw funds from that account absent student agreement, and that, a student and faculty advisor must co-sign the check.

Although the evidence shows TAMU did not actually exercise control over the details of the direction of the play, Dean Hearn testified that the faculty advisors had the right to make the Wonios comply with university rules, including the prohibition against use of weapons on campus and the prohibition against removal of the podium in the auditorium (a campus policy due to electrical connections). Hearn further testified the faculty advisors could have stopped the play and dismissed the directors. To this extent, Hearn agreed the university had the right to control the Wonios' work.

Michael Wonio testified he considered the producer of the play to be TAMU. The Wonios testified that, as producer, TAMU had control over the details of the play, direction of the play, where and when the play would be held, the furnishing of electricity and funding, and whether the Wonios would be asked to direct future plays.

In *Anchor Cas. Co. v. Hartsfield,* 390 S.W.2d 469 (Tex.1965), a carpenter alleged he was an employee of the construction company for which he performed services at the time he was injured. There was no contract explicitly giving the construction company the right to control the details of the carpenter's work and the only evidence of right of control was the carpenter's testimony that the company could have told him what to do and he would have done it. *Id.* at 471. The court reiterated the "highly important evidential element of actual exercise of control in establishing the employee relationship in cases where the terms of employment are indefinite," and found that the carpenter's testimony was no more than a scintilla of evidence of the right of control. *Id.*

In a more recent case, *Continental Ins. Co. v. Wolford,* 526 S.W.2d 539 (Tex.1975), a bricklayer testified his alleged employer could have fired him anytime if dissatisfied with his performance. There was no contract giving the alleged employer the right to control the details of the worker's per-

formance. *Id.* at 540. There was instead an oral contract the worker would be paid seven cents for each brick laid. *Id.* The supreme court found the alleged employer's authority to terminate a worker was evidence of a minimal degree of control present in any working relationship and afforded no basis for determining worker's status as employee. *Id.* at 541–42.

Because there was no contract explicitly giving TAMU the right to control the details of the direction of the play and no evidence of the exercise of control, we must look at other evidence of the right of control. The only possible evidence of a right of control is the testimony about the right to discharge the directors and the right to prohibit dangerous activities. Bishop argues that TAMU had the right to control the details of the Wonios work because it had the responsibility to supervise and control student activities. Bishop further argues the university should be held liable for the negligent exercise of its assumption of the responsibility for the proper use of tangible personal property, which in this case was the knife. In support of these arguments, Bishop cites *Sem v. State*, 821 S.W.2d 411 (Tex.App.-Fort Worth 1991, no writ) and *Smith v. University of Texas*, 664 S.W.2d 180 (Tex.App.-Austin 1984, writ ref'd n.r.e.).

We find these cases inapplicable. *Sem* does not involve a claim under the Texas Tort Claims Act and the court did not apply the law requiring that the worker be an employee of the governmental unit. *See Sem*, 821 S.W.2d at 414–415. *Smith* concerns the question whether the governmental entity negligently used tangible property, 664 S.W.2d at 187–88, a question that need not be reached if the governmental entity is not the employer of the persons directly involved with use of the property.

Because the right to fire a worker is present in any working relationship, the university's authority to terminate the play directors is not determinative of the right of control. *Wolford*, 526 S.W.2d at 541–42.

That the university could have prohibited dangerous activities and actions in violation of campus policy is, in our opinion another example of authority an alleged employer would retain regardless of whether the Wonios were employees or independent contractors. *See id.* at 541. The minimal degree of control shown by the university's authority to terminate employment and prohibit dangerous activities is not evidence that the details of the Wonios work were being controlled or were subject to the university's control.

■ Although the Wonios testified that the university had the right to control their work, they agreed that the university had never exercised control other than to prohibit removal of a podium from the stage. A worker's testimony that the alleged employer had the right of control is no more than a scintilla of evidence of the requisite right of control. *See Anchor Cas. Co.*, 390 S.W.2d at 471 (worker's testimony he would have obeyed anything construction company asked him to do held to be no evidence of right of control over details of work).

The evidence shows the Wonios were in the paid service of the university, but not as employees. Instead, the evidence shows the Wonios occupied the status of independent contractors as a matter of law. Therefore, we find there is no evidence to support the jury's finding that Mike and Diane Wonio were employees of TAMU on the occasion in question.

■ TAMU also claims the evidence does not support the jury's finding that Drs. Curley and Lesko were employees on the occasion in question. TAMU argues the faculty advisors were not in the paid service of the university on the occasion in question, but were acting as volunteers.

■ The evidence shows that Dr. Curley is employed by TAMU as a professor of English and head of the Department of General Academics. Dr. Lesko teaches organic chemistry and is Assistant Depart-

ment Head of the Degreed Science Department. Thus, there was evidence Drs. Curley and Lesko were paid employees of the university for their academic positions. Drs. Curley and Lesko also acted as faculty advisors to the Drama Club. A number of witnesses testified that faculty advisors were volunteers and were not paid for this service. Volunteers are not included in the Texas Tort Claims Act definition of "employee." *Harris County v. Dillard*, 883 S.W.2d 166, 167 (Tex.1994).

A review of the record reveals no testimony establishing that the faculty advisors were paid for performing the non-academic role of faculty advisor to the Drama Club. Although there was evidence student clubs are an enrichment activity and that funds for the clubs are derived from student fees and university grants, there was no evidence of benefit to the faculty advisors other than the ability to include this activity on their resumes. Thus, no evidence supports the jury's finding that, while functioning as faculty advisors to the Drama Club, Drs. Curley and Lesko were in the paid service of TAMU. We sustain point of error one. Having sustained this point of error, we need not address TAMU's remaining points of error.

Because we have found the evidence legally insufficient to support the jury's findings that Michael and Diane Wonio, Dr. Stephen Curley, and Dr. Melanie Lesko were employees on the occasion in question, there can be no liability on the part of the university. Accordingly, we reverse and render judgment in favor of TAMU.

RICHARD H. EDELMAN, Justice, dissenting.

The majority opinion concludes, in part, that the faculty advisors were not "employees" of Texas A & M University ("A & M"), within the meaning of section 101.001(2) of the Texas Tort Claims Act, because, in working with the Drama Club, they were unpaid volunteers and thus not in the "paid service" of the University. In *Dillard*, which the majority opinion cites as its authority for this conclusion, Harris County was sued for the conduct of a "reserve" deputy sheriff who was involved in an automobile collision. *See Harris County v. Dillard*, 883 S.W.2d 166, 167 (Tex.1994). The Texas Supreme Court held that the deputy was not in the paid service of Harris County, and thus not an "employee" under the Tort Claims Act, because he was solely a volunteer reserve deputy who was not being paid by the County at all. *See id.*

By contrast, in this case, as the majority opinion correctly states, the evidence is undisputed that the faculty advisors were paid employees of the University for their academic positions. Thus, there is no evidence that the faculty advisors were unpaid by A & M but only that they received no *additional* compensation for also serving voluntarily as faculty advisors for the Drama Club. The evidence indicates that student organizations were required to have faculty advisors and, thus, that a person was eligible to hold such a position only by virtue of his employment as a faculty member. The evidence further reflects that, although faculty members were not required to serve as faculty advisors, doing so gave them credit for the "community service aspect" of their faculty position. Moreover, the faculty advisors were responsible for ensuring that students in the Drama Club complied with University regulations. Under these circumstances, I would hold that the faculty advisors, who were employed and paid by A & M as faculty members and who, when serving as faculty advisors, were acting not only in their capacities as faculty members but also in furtherance thereof, were no less in the "paid service" of A & M with regard to that aspect of their employment merely because they received no additional compensation for it. Therefore, I would not reverse the judgment on the ground that the evidence was legally insufficient to support the jury's findings that the faculty advisors were employees.