Marjorie Ann DAVIS, Plaintiff-Appellant,

v.

Wayne DAVIS, Defendant-Appellee.

Supreme Court of Tennessee,
at Nashville.

Oct. 3, 1983.

Royce Taylor, Murfreesboro, for plaintiff-appellant.

William C. Moody, Nashville, for defendant-appellee.

OPINION

BROCK, Justice.

The issue before the Court concerns the continued validity of the doctrine of interspousal immunity; specifically, whether that common law doctrine should be allowed to preclude a negligence action by one spouse against the other.

On June 5, 1979, the plaintiff-appellant, Marjorie Ann Davis, was riding as a passenger in a motorized fishing boat which was being operated by her husband, the defendant-appellee, Wayne Davis. At approximately 2:00 p.m. Mr. Davis set a course across Percy Priest Lake, intent on returning to the landing where he and his wife had earlier launched the boat. While proceeding across the lake the boat struck a bridge support and the impact resulted in serious injury to Mrs. Davis.

The appellant alleged that she sustained three fractures in one leg and cuts and bruises on her head, arms and upper body. She further alleged that the accident occurred because her husband had "failed to exercise that degree of care that an ordinary, prudent person would have exercised under the same, or similar, circumstances." Simply stated, she attributes her injuries to the negligence of her husband and attempts to recover damages therefor.

When faced with a motion for summary judgment which asserted interspousal immunity as a bar, the trial court dismissed Mrs. Davis' lawsuit. The Court of Appeals observed the rule of *stare decisis* and affirmed the lower court's dismissal.

■ The formalistic legal foundations that originally lent support to the doctrine of interspousal immunity have long ago crumbled away. It is irrefutable that, although the doctrine does not discriminate between a husband and wife in denying one a cause of action against the other, its early existence can be traced to a concept that only imposed legal disability on the wife; that concept is unity.[1]

1. Sir Henry Sumner Maine observed:

"We have several times laid down that early law takes notice of Families only; this is the

The Washington Supreme Court has aptly noted:

"The 'supposed unity' of husband and wife, which serves as the traditional basis of interspousal disability, is not a reference to the common nature or loving oneness achieved in a marriage of two free individuals. Rather, this traditional premise had reference to a situation, coming on from antiquity, in which a woman's marriage for most purposes rendered her a chattel of her husband." *Freehe v. Freehe,* 81 Wash.2d 183, 186, 500 P.2d 771, 773 (1972).

In *McKelvey v. McKelvey,* 111 Tenn. 388, 77 S.W. 664 (1903), this Court said:

"It has been held that neither husband nor wife can maintain an action against the other for wrongs committed during coverture. *This holding rests in part upon their unity by virtue of the marriage relation,* which would preclude the one from suing the other at law, and in part upon the respective rights and duties involved in that relation." (Emphasis added.) 77 S.W. at 665.

This litany, that interspousal immunity is shielded from critical analysis because unity is an incident of marriage, has been invoked without fail as a justification for preventing one spouse from suing the other.

In *Tobin v. Gelrich,* 162 Tenn. 96, 97, 34 S.W.2d 1058 (1931), a wife sued her husband for injuries she sustained due to his alleged negligent operation of the automobile in which they were riding. The defendant's demurrer was sustained and an appeal was commenced by plaintiff. This Court affirmed, saying:

"By the common law, neither the husband nor the wife could maintain an action against the other for wrong committed during coverture. The rule rested

upon the nature of the relation, the *unity of interest* of husband and wife in each other's respective rights and duties and was not limited to actions for willful wrongs, such as assault and battery, but embraced alike all torts." (Emphasis added.) *Id.*

In *Prince v. Prince,* 205 Tenn. 451, 326 S.W.2d 908 (1959), this Court articulated a subtle distinction between the prohibition on interspousal tort litigation as it has developed in this State and the manner in which it is applied elsewhere. In most states, even though a cause of action arises when one spouse acts tortiously against the other, the immunity defeats the cause of action. Past decisions of this Court make clear that "the right of action never existed." *Prince v. Prince, supra,* 326 S.W.2d at 910, quoting from *Wilson v. Barton,* 153 Tenn. 250, 283 S.W. 71 (1926). The Court explained:

"Under this view, based primarily on the common-law doctrine of the unity of husband and wife, there is never any cause of action; it is not simply a matter of granting an immunity as is elsewhere the doctrine." 326 S.W.2d at 910.

In *Gordon v. Pollard,* 207 Tenn. 45, 336 S.W.2d 25 (1960), a woman brought suit against her former husband for damages arising out of an automobile accident. The complaint alleged that she was riding as a passenger and guest in an automobile being operated by Johnny Pollard, her husband at the time of the accident, which automobile was owned and maintained by the defendants, Mrs. Lorence Pollard and C.P. Pollard, his mother and father, as a family purpose car. The complaint contained allegations of common law and statutory negligence.

The defendants countered by pointing out that at the time of the accident Johnny

same thing as saying that it only takes notice of persons exercising Patria Potestas (Powers of the Father), and accordingly the only principle on which it enfranchises a son or grandson at the death of his Parent, is a consideration of the capacity inherent in such son or grandson to become himself the head of a new family and the root of a new set of Parental Powers. But a woman, of course,

has no capacity of the kind, and no title accordingly to the liberation which it confers. There is therefore a peculiar contrivance of archaic jurisprudence for retaining her in the bondage of the Family for life." H. Maine, Ancient Law 152–53 (1st ed. 1861).

Unity, a concept of recent vintage compared to "Patria Potestas," is such a contrivance.

Pollard was lawfully married to the plaintiff, Doris Gordon.

The plaintiff's theory in *Gordon v. Pollard, supra,* rested on the fact that her marriage had been annulled and was, therefore, void ab initio. The plaintiff was only seventeen and the marriage license had apparently been obtained by misrepresentation or fraud. This Court rejected plaintiff's appeal, however, saying:

"We think that the annulment of a voidable marriage may well restore certain existing property and statutory rights to a spouse, but does not create in a spouse, husband or wife, a right to maintain an action against the other for a tort which occurred in Tennessee during the period the status of the parties was that of husband and wife.

"Upon the solemnization and consummation of the marriage of the plaintiff and defendant, each was subject to all of the privileges and all of the disabilities of coverture, and these privileges and disabilities continued until the marriage was avoid by the plaintiff.

\* \* \* \* \* \*

"To give an annulment decree such an effect would be to substitute legal theory for practicality. The retroactive effect of annulment is not without limits, prescribed by policy and justice." 336 S.W.2d at 27.

Policy may have been served in *Gordon v. Pollard, supra,* but justice surely was not. In our minds, legal theory was paid homage at the expense of pragmatism and reason. The plaintiff was suing under the family purpose doctrine so any liability would have been the responsibility of Johnny Pollard's parents. Because she rashly entered into marriage at the tender age of seventeen, a union that was subsequently annulled, the plaintiff was denied access to the court "because there [was] no civil right to be redressed." 336 S.W.2d at 26. We think the decision in *Gordon v. Pollard, supra,* is illustrative of the irrational and unjust results that may come from judicial adherence to once utilitarian, but now outmoded legal tenets.

In *Hance v. Haun,* 216 Tenn. 176, 391 S.W.2d 621 (1965), the plaintiff brought suit against his step-father under T.C.A., § 20–607 (presently T.C.A., § 20–5–106), for damages for the wrongful death of his mother, whom his step-father intentionally shot and killed. This Court affirmed the decision of the trial court in sustaining defendant's demurrer, and held:

"It is quite plain then that the right of the plaintiff in this case to recover against his stepfather is derivative only as coming to him through the right of his mother to have prosecuted a claim for damages against her husband. Since the law of this State does not permit one spouse to sue the other for tort during coverture, she had no right of action which could pass to her next of kin." 391 S.W.2d at 624.

Recently, when presented with the opportunity of affirming *Hance v. Haun, supra,* we chose instead to expressly overrule it. The case of *Luna v. Clayton,* 655 S.W.2d 893 (Tenn.1983), was factually identical to *Hance v. Haun, supra,* and yet we allowed the wrongful death action to proceed, stating:

"This Court recognizes that courts may have previously fashioned a rule of immunity from wrongdoing, having adopted a posture at an earlier date in response to what appeared to be desirable then as a matter of policy; yet when it later appears to be unsound within a given context, especially when the reasons upon which the immunity is based no longer exist, it remains within the domain of the judiciary to reject the applicability of such a rule." 655 S.W.2d at 897.

We limited our holding in *Luna v. Clayton, supra,* to the facts presented therein, saying:

"Whether the reasons underpinning the doctrine of interspousal immunity are valid and viable within other contexts must await future consideration." 655 S.W.2d at 897.

Nevertheless, our exposition in *Luna* citing the present status of interspousal immunity

in each of our 49 sister states reveals a decided trend away from the doctrine.

In all of the cases previously discussed in this opinion, unity is either expressly or impliedly cited as the theoretical underpinning of interspousal immunity. Curiously enough, in a decision rendered by this Court construing whether the Married Women's Emancipation Act abrogated interspousal immunity, it was held that the legislature intended to abolish unity but not marital immunity. That holding, in and of itself, is not objectionable.

The Married Women's Emancipation Act, T.C.A., § 36–601 (Ch. 26, Acts of 1913), removed the disabilities of coverture from married women. In *Lillienkamp v. Rippetoe,* 133 Tenn. 57, 179 S.W. 628 (1915), a woman attempted to bring suit for an assault and battery committed by her husband upon her person during coverture. She contended that the Married Women's Emancipation Act had effectively removed the interspousal immunity for tort actions. This Court rejected that contention in the following manner:

"Examination of the cases cited to sustain the existence of the common-law rule first laid down herein will disclose a practically unanimous concurrence of judicial opinion to the effect that an abrogation of the common-law rule will only be held to have been accomplished by a statute when such purpose is clearly expressed therein.

\* &ast; \* \* . \* \*

"We must assume that the Legislature had in mind in the passage of the act the fundamental doctrine of the unity of husband and wife under the common law, and the correlative duties of husband and wife to each other, and to the well-being of the social order growing out of the marriage relation, and that, if it had been the purpose of the Legislature to alter these further than as indicated in the act, that purpose would have been clearly expressed, or would have appeared by necessary implication." (Emphasis added.) 179 S.W. at 629.

The disabilities of coverture only afflicted married women; the Married Women's Emancipation Act, by eradicating those disabilities, did not also abrogate interspousal immunity, which afflicts men and women alike. We agree with the following statement by Mr. Justice Harbison, which he made in *Luna v. Clayton, supra,* dissenting:

"In my view the Married Women's Emancipation statutes are not dispositive of this subject. The immunity was not gender-based or discriminatory as to sex. A husband could no more sue his wife than she could sue him." 655 S.W.2d at 898.

We regard the construction of the Married Women's Emancipation Act in *Lillienkamp, supra,* as correct. It is anomalous, however, that even though "the Legislature had in mind ... the fundamental doctrine of the unity of husband and wife under the common law, ..." when it removed the disabilities of coverture, retention of interspousal immunity has consistently been substantiated on the basis of unity. Unity, the pillar upon which interspousal immunity has rested for so many years, was abolished by the legislature in 1915.

Nevertheless, interspousal immunity has acquired an existence of its own, and perpetuation of the doctrine is seemingly undeterred by the elimination of the anachronistic concepts which spawned it.

Why has the doctrine survived for so long while the old notions that gave it birth have been discarded by contemporary society? We think the answer is obvious. New justifications have emerged to nourish the rule so that its vitality may be ensured in the context of modern jurisprudence. In *Luna v. Clayton, supra,* while stating the contentions of one of the parties, we set forth some of the more recent arguments in favor of retaining interspousal immunity, as follows:

"Defendant argues for retention of the doctrine in its entirety based upon the traditional reasons courts have given in upholding its applicability, that is, abolition of interspousal tort immunity (1) would necessarily undermine and destroy marital harmony and tranquility, (2) would encourage fraud and collusion

where a defendant is protected by insurance, (3) would overburden the judicial system with a multitude of trivial and frivolous lawsuits, and (4) would violate the principle of *stare decisis* and should await legislative sanction." 655 S.W.2d at 896.

We are not convinced that these purported justifications, considered singly or in unison, are sufficient cause to maintain the common law prohibition on interspousal tort litigation in this State.

In response to the position advocated by many, including the defendant-appellee in the case at bar, that derogation of interspousal tort immunity will have a harmful effect on family harmony, we think the following reply by the West Virginia Supreme Court of Appeals to be perspicacious:

"Undoubtedly family harmony is a laudable goal in this era of rising divorce rates. However, it is difficult to perceive how any law barring access to the courts for personal injuries will promote harmony. If this were a valid sociological consideration, the Legislature could orchestrate even greater harmony by abolishing the statute giving the right to divorce. Moreover, there is an obvious fallacy in this argument, as under the Married Women's Act it has long been recognized that spouses may sue each other in regard to their property rights." *Coffindaffer v. Coffindaffer,* 244 S.E.2d 338, 342 (W.Va. 1978).

In *McKelvey v. McKelvey, supra,* this Court spurned an assault on interspousal immunity by holding:

"We are not convinced that it is desirable to have the law as the plaintiff contends it to be. There is no necessity for it. Practically the married woman has remedy enough. She has the privilege of the writ of habeas corpus if lawfully restrained. As a last resort, if need be, she can prosecute at her husband's expense a suit for divorce." 77 S.W. at 665.

Although the plaintiff in *McKelvey, supra,* was a woman, the solutions suggested above would, of course, be available to a husband too. The point to be made, however, is that neither of these avenues provides a desirable alternative. It is inconceivable to this Court that the supposed benign influence of interspousal immunity is regarded as solicitous of family harmony when it is only applied after one member of a marriage has made a decision to seek legal redress against the other. In *Johnson v. Johnson,* 201 Ala. 41, 77 So. 335 (1917), a case of assault and battery, the Alabama Supreme Court made the following observation, which we think pertinent to interspousal torts perpetrated either intentionally or negligently:

"[A]s for the policy which would avoid the public airing of family troubles, we see no reason why it should weigh more heavily against this action than against those which the courts universally allow." 77 So. at 338.

Justice Harbison, who dissented in *Luna v. Clayton, supra,* expressed the opinion that:

"[T]he institution of marriage will [not] come to an end or be irreparably damaged by permitting tort actions, intentional or negligent. Those who state that married persons are not in a different status from others, however, in my opinion are in error and need only examine the numerous statutes in this state on the subject." 655 S.W.2d at 898–899.

We agree with both of the above statements; however, the fact that married persons are in a different status from others is not sufficient to conceal interspousal immunity from judicial scrutiny.

The next argument urged upon us is that the abolition of interspousal immunity will result in the increased propagation of fraudulent claims. We think our disposition of the defendant-appellee's claim in *Luna v. Clayton, supra,* that abolition of interspousal tort immunity would encourage fraud and collusion, is equally applicable in this case. In *Luna* we said:

"Our judicial system is not so ineffective that we must fear frivolous suits to deny relief to a plaintiff otherwise entitled simply because in some prospective appli-

cation a litigant may be guilty of fraud or collusion. Built into the judicial process are numerous safeguards against fraudulent claims such as the deterrent of a perjury charge, modern discovery procedures, and the presentation of evidence to juries, all inherent in the Tennessee Rules of Civil Procedure and designed to eliminate surprise and uncover the truth by revealing all the relevant facts. These same factors also militate against claims that insurance companies may be disadvantaged tactically. Moreover, to the extent that insurance companies may fear collusive actions, they have the right to protect themselves by either restricting the scope of their coverage or adjusting premiums accordingly." 655 S.W.2d at 896–897.

We now turn our attention to an argument that is often posited when a longstanding rule, such as interspousal immunity, is attacked. The argument is two pronged: first, it is asserted that *stare decisis* requires that prior decisions be honored; second, it is said that a court acts extra-judicially when it vitiates a time-honored rule of law, and exceeds the scope of its intended governmental function.

To the first prong of the argument we can only reply that our commitment to *stare decisis* remains strong. Confidence in our courts is to a great extent dependent on the uniformity and consistency engendered by allegiance to *stare decisis*. However, mindless obedience to this precept can confound the search for truth and foster an attitude of contempt.

The second prong of the argument is particularly inappropriate in this case. The defendant-appellee argued that the preservation of family harmony and the prevention of fraud was dependent on the retention of interspousal immunity. We do not

agree that the doctrine promotes those worthwhile ends; and even if we did judicial restraint would prohibit our acting on that belief. As stated earlier, unity is the basis upon which courts of this state have sought to preserve interspousal immunity. Arguments relating to family harmony and the impending spectre of fraudulent claims have never been a part of the jurisprudence of this State on the subject of interspousal immunity,[2] nor do we see any good reason to adopt such arguments as policy now.

We do not believe that abolition of the doctrine of interspousal immunity would constitute a breach of the demarcation that separates adjudication from legislation. As we recently said in *Kilbourne v. Hanzelik*, 648 S.W.2d 932 (Tenn.1983):

"Legislative action could, of course, be taken, but we abdicate our own function, in a field peculiarly non-statutory, when we refuse to consider an old and unsatisfactory court-made rule." 648 S.W.2d at 934, quoting from *Manatee Convalescent Center, Inc. v. McDonald*, 392 So.2d 1356, 1357 (Fla.Dist.Ct.App.1980).

In *Luna v. Clayton, supra,* we created an exception to the doctrine of interspousal immunity by allowing the survivor of one spouse intentionally killed by the other to bring a cause of action for wrongful death. The instant case is an attempt by one spouse to recover for personal injury allegedly caused by the negligence of the other. There is a broad spectrum of tort actions between our holding in *Luna* and the cause of action presented by the case at bar. The following language expresses our view:

"The instant case ... involves a negligent tort rather than an intentional one. We are of the opinion that insofar as interspousal liability for tort is concerned there is no logical or legal reason for

2. One commentator, while noting our failure in *Childress v. Childress*, 569 S.W.2d 816 (Tenn. 1978), "to mention the common-law unity concept in light of ... [*Robinson v. Trousdale County*, 516 S.W.2d 626 (Tenn.1974) *supra*]", observed that:

"The court failed to mention any of the other three policy considerations, ... (preservation

of domestic tranquility, other remedies are adequate, prevention of fraudulent claims) ... so presumably they are not deemed by the court to be justifications for retention of the doctrine in Tennessee. Comment, Interspousal Tort Immunity: An Analysis of a Dying Doctrine And Its Status In Tennessee, 47 Tenn.L.Rev. 123, 139 n. 106 (1979).

drawing a distinction between the two, ...." *Klein v. Klein,* 58 Cal.2d 692, 693, 26 Cal.Rptr. 102, 103, 376 P.2d 70, 71 (1962).

The legal abstraction of unity, now an historical oddity rather than a functioning concept of law, is no longer available to support retention of interspousal immunity. Moreover, we are not convinced that family harmony can be preserved and fraud prevented by continued application of the doctrine. Finding no plausible reasons for retaining it, and cognizant of the high cost exacted by the rule because of the absolute bar it places in the path of potentially meritorious claims, we hold that interspousal tort immunity is totally abolished in this State. All decisions to the contrary are overruled.

■ The trial judge was correct, under the then existing law, in granting the motion for summary judgment. However, we have decided that the rule applied has been orphaned by logic and reason, and direct that the summary judgment be set aside and the matter remanded for further proceedings consistent with this opinion.

COOPER and DROWOTA, JJ., concur.

HARBISON, J., and ALLISON B. HUMPHREYS, Special Justice, dissent with each filing a separate dissenting opinion.

HARBISON, Justice, dissenting.

I respectfully dissent for the reasons stated in the dissenting opinion in *Luna v. Clayton,* 655 S.W.2d 893 (Tenn.1983).

I think that the subject of spousal immunity is so firmly rooted in the jurisprudence of this state, both statutory and common law, that its modification or abrogation should be considered and acted upon by the elected representatives of the people, the General Assembly. As pointed out in the dissent in *Luna v. Clayton, supra,* not only is the rule firmly embedded in the common law of this state, but statutory law surrounding the family and its incidents has been predicated upon the assumption that there is no right of action between spouses for torts committed during marriage.

I agree with the majority opinion that many of the reasons given to support marital immunity are superficial and not convincing. On the other hand the impact of a decision such as this upon numerous statutes, as discussed in *Luna v. Clayton,* is, or can be in many instances, very great, and such a fundamental change in the public policy of this state, in my opinion, should be made after deliberation by the General Assembly.

For these reasons I respectfully dissent.

ALLISON B. HUMPHREYS, Special Justice, dissenting.

I concur in Justice Harbison's dissent, and add some observations of my own.

The forces that pull a judge in the direction of allowing a person a day in court for redress of an alleged wrong are very strong. These forces have found expression in statements such as, "do justice though the heavens fall," "there is no wrong without a remedy," and so on. But all of us know that there are some wrongs that cannot be remedied and that we should not bring down the heavens in order to give a litigant a day in court. We know that when to create a new remedy will weaken one of the foundations of our society we must refrain from doing it. Society must not be in any degree destroyed or even weakened in order that one litigant may be afforded a remedy.

We must remember that without society, without the social contract under which we all live being kept strong, there would be no judiciary. There would be no need for it. Society does not exist because of the judiciary. The judiciary exists because of society. So the first obligation of the judiciary is to do nothing that would weaken society even if this means denying, in the exceptional instance, a day in court to a party who has suffered an injury.

I am afraid the majority has ignored this basic truth in this case, for it cannot be denied that the family unit is one of the indispensable foundations of society and

that our first obligation is to do nothing that may weaken it.

So, because it is inevitable that the newly created right of spouses to resort to court in every instance of thoughtless failure of one spouse to exercise ordinary care, will weaken, if not destroy, the trust and tranquility and unity necessary to a family life, I elect not to take a hand in doing this. There are already enough forces at work in present day society tending to weaken the family unit, without this additional blow being struck at it.

Weaken the family unit, what is being done today will do it: for, if in the name of abstract justice, it is reasonable for one spouse to have the right to sue the other for simple negligence, how can this right be denied to the child? Of course, it cannot.

If all of the family members are free to sue each other, and they are if the majority reasoning is carried to its logical end, what becomes of the family unit then?

Under the common law of the state, the husband is already liable to furnish his wife and children with the reasonable necessities of life: such as clothing, shelter, food, medical attention, et cetera. How is this obligation affected by this new inchoate liability we are creating? How is this obligation affected by final judgment and right to execution against the father or husband?

How will this new potential liability affect the exercise of parental discipline?

With excellent law schools spawning ingenious new lawyers in ever-increasing numbers we can look forward to the day when there will be clinics specializing in this new branch of family law we are creating. We may even see the day when clinics will advertise that interspousal and interfamily lawsuits are a specialty of the house.

So, while it is invigorating to take part in opening new frontiers, the opening of this one is something I prefer not to have part in.

If it is indispensable that a cause of action be provided for interspousal and interfamily torts, the providing of this remedy should be left to the Legislature. The Legislature can deal with all of the ramifications that the application of logic to the general premise will necessarily lead to. The Legislature will not be bound to make these logical extensions of the general premise. It could exempt spouses from suits because of failure to exercise ordinary care in the home. There should not be a cause of action because one member of the family has left a book on a staircase or a wife has waxed the floor under a throw rug, or one using the shower or the bathtub has failed to remove the remnants of a bar of soap, and these things have led to an accident. It is simply unreasonable to cast this pall of liability over everything that is done by all the different family members in the home that can and sometimes do result in injury. But, under the logical extension of the rule adopted in this case, suits can be brought because of the doing of any of these things.

The Legislature could also define the circumstances under which a child could sue its parents. The Legislature could recognize that the right of the child to sue its parents would tend to destroy the right and power of the parent to exercise disciplinary control over the child, and make provision for this; something this Court cannot do unless it is truly going to act as a legislature.

In fact, the Legislature could consult the will of the people who elect them for the express purpose of making new law (the purpose for which judges are not elected) and act according to the people's will in the matter, a will which may be, after all, that matters be left as they are.