IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 27, 2012 Session

# IN RE MADILENE G. R.

**Appeal from the Chancery Court for Rutherford County**
**No. 11CV-579      Robert E. Corlew, III, Judge**

**No. M2012-01178-COA-R3-PT - Filed January 10, 2013**

The biological father of the child at issue appeals the termination of his parental rights and the dismissal of Father and Step-Mother's petition for custody and counter-petition for step-parent adoption. The petition for termination was filed by the partial guardians who were seeking to adopt the minor child. The trial court determined that there was clear and convincing evidence that Father willfully failed to support the mother for the four months prior to the birth of the child and willfully failed to support the child for the four months prior to the filing of the petition. The trial court also found that termination was in the best interest of the child. We have determined that one ground for abandonment was established by clear and convincing evidence, however, we have also determined that the evidence does not clearly and convincingly demonstrate that termination of Father's parental rights is in the child's best interest. Accordingly, we reverse the termination of Father's parental rights. We have also determined the trial court erred in dismissing Father and Step-Mother's petition for custody and counter-petition for step-parent adoption and remand this issue for further proceedings consistent with this opinion. The judgment of the trial court is affirmed in part, reversed in part, and this matter is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in part, Reversed in part, and Remanded**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which RICHARD H. DINKINS, J., joined. PATRICIA J. COTTRELL, P.J., M.S., filed a separate concurring opinion.

Tarsila Crawford and James Widrig, Nashville, Tennessee, for the appellants, Justin M. and Lauren B. M.

Daniel Lyn Graves, II, for the appellees, William and Jessica H.

## OPINION

This action presents an unusual and disputed set of facts arising after a brief three-month relationship between Justin M. ("Father") and Janetta R. ("Mother"). Father and Mother engaged in an infrequent relationship starting at the end of November 2009 and ending in January 2010. Mother and Father met in October of 2009 and developed a friendship. The friendship evolved into a brief sexual relationship during which they went on one date and Mother made two trips to visit Father in Texas and Arkansas where he was working. Following the second trip to visit Father, Father ended the relationship.

After the relationship ended, Mother discovered that she was pregnant. When she informed Father of the pregnancy and her belief that he was the biological father, Father responded stating he was skeptical as to the paternity of the child. This was due in part to representations made by Mother during their relationship that it was impossible for her to have any additional children due to complications from previous pregnancies and Father's suspicion that she had another boyfriend during the relevant period. Nevertheless, the parties discussed several options for the child including abortion and adoption. Father expressed his desire to take a paternity test. He also stated he was unwilling to provide money for an abortion.[1]

Mother and Father had little contact during her pregnancy. Mother testified that she tried to contact Father several times via text, email, and social media web sites, particularly Facebook. Father acknowledged that Mother communicated with him during the pregnancy but stated it was not about the pregnancy; it was her attempts to restart their previous relationship.

Mother and Father had no contact between August 2010 and January 2011. Mother requested no support from Father for any pregnancy-related expenses during her pregnancy and Father offered no support.

During the sixth or seventh month of her pregnancy, Mother contacted Jessica and William H. and presented the idea of them adopting the child.[2] Mother informed them that Father was not interested in being a parent and would not oppose the adoption. Mr. and Mrs.

---

[1]At the trial, Father testified he did not want to provide money for an abortion because should the child be his, he would not want the child to be aborted. Mother testified that she believed that Father simply did not have the money.

[2]Mother has given birth to three or four children and Mrs. H. previously helped babysit one of Mother's other children, who was now in the sole custody of that child's biological father. Because of their previous relationship, Mother was aware that the couple was interested in adopting a child.

H agreed. Mr. and Mrs. H and Mother stayed in contact with Mother during the remainder of her pregnancy, but they did not provide any support or attend any doctor's visits with Mother. Neither Mother nor Mr. and Mrs. H informed Father of their plan for a private adoption.

The child was born on September 27, 2010. Mother testified that she sent Father a text message on the way to the hospital informing him of the impending birth and asking if he wished to be present. Mother claims she received a text message back stating that Father was in Florida. Father testified that he never received a text message. Mr. and Mrs. H were present at the hospital and when the child was released they took the child home with them.

On October 14, 2010, Mother surrendered her parental rights to the child before the Chancellor of the Chancery Court for Rutherford County. At the surrender, Mother provided the name and phone number of Father and the address of Father's parents. That same day, the trial court entered an order of partial guardianship granting custody to Mr. and Mrs. H (hereinafter referred to as "the Guardians"). Father received no notice of the hearing or the order of guardianship.

In January of 2011, Father contacted Mother about the child at which time he learned the child was no longer in Mother's custody. Mother did not give Father the Guardians' information, but she promised to contact them. Thereafter, Father was contacted by the Guardians' attorney. Father requested a paternity test to determine if he was the child's biological father. By agreement, a DNA test was performed and in March of 2011, the test results confirmed that Father was the biological parent.

On April 8, 2011, Father filed a Rule 60 Motion to Set Aside the Order of Partial Guardianship seeking to be named the guardian and to obtain custody of his child. On the same day, April 8, 2011, the Guardians filed a Petition for Adoption and Termination of Parental Rights. In the petition, the Guardians alleged that Father's parental rights should be terminated on the grounds of abandonment pursuant to Tennessee Code Annotated § 36-1-102; failure to pay a reasonable share of prenatal, natal, and postnatal expenses without a good cause or excuse pursuant to Tennessee Code Annotated § 36-1-113(9)(A)(i); failure to manifest a willingness to assume legal and physical custody of the child pursuant to Tennessee Code Annotated § 36-1-113(9)(A)(iv); that placement of the child in Father's custody would pose a substantial risk of harm pursuant to Tennessee Code Annotated § 36-1-113(9)(A)(v); and as set forth in Tennessee Code Annotated § 36-1-113(9)(A)(vi) that Father failed to file a petition to establish parentage within thirty days after notice of the alleged paternity, or as required in Tennessee Code Annotated § 36-2-318(j), or after making a claim of paternity pursuant to Tennessee Code Annotated § 36-1-117(c)(3). Father filed an Answer.

Father's Rule 60 motion came on for hearing on April 25, 2011. At the hearing Father additionally requested visitation. The visitation request was denied by the trial court from the bench. In an order entered on May 5, 2011, the court found no grounds to grant Rule 60 relief and dismissed Father's Rule 60 motion.

On May 27, 2011, Father and his wife, Lauren M., filed a Petition to Establish Parentage and for Custody and a Counter-Petition for Step-Parent Adoption. The case was set for trial on December 12, 2011, however, following a motion by the Guardians for the appointment of a guardian ad litem, the scheduled trial date was continued. Father again requested visitation with the child during the hearing on the motion for continuance, which the trial court again denied.

Pursuant to an agreed order entered on December 20, 2011, the parties stipulated that Father was the biological parent of the child.

The competing petitions were tried on January 26, 2012. The witnesses at trial were Mother, Father, Father's wife, and the Guardians. On February 13, 2012, the trial court issued a Memorandum Opinion denying the petition filed by Father and his wife for custody and step-parent adoption and granting the petition filed by the Guardians to terminate Father's parental rights and adopt the child. As grounds for terminating Father's rights, the trial court found that for more than four consecutive months prior to the filing of the petition, Father willfully failed to support the child and that he did not visit with the child and only made minimal attempts to visit or to have any relationship with the child. The court also found that Father willfully failed to support the biological mother for the four consecutive months prior to the birth of the child and that termination was in the child's best interest. In an order entered on February 23, 2012, the trial court terminated Father's parental rights on the grounds of willful failure to support the child for the four months prior to the filing of the petition and the failure to support the biological mother for the four consecutive months prior to the child's birth and that termination of Father's parental rights was in the best interest of the child. Father filed a timely appeal.

**ANALYSIS**

I. STANDARD OF REVIEW

"A biological parent's right to the care and custody of his children is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. 2005). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *Id*.

While a parent's right to the care and custody and control of his children is "fundamental and superior to the claims of other persons and the government, it is not absolute." *Id*. Parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). However, "[b]ecause the stakes are so profoundly high," Tennessee Code Annotated § 36-1-113(c)(1) requires persons seeking to terminate a parent's parental rights to do so by evidence that clearly and convincingly establishes that ground. *In re Audrey S.*, 182 S.W.3d at 860. This heavy burden of proving that there exists a statutory ground for termination falls upon the person seeking the termination of a biological parent's parental rights. *See* Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. . ., and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 860 (internal citations omitted). In order to terminate a parent's parental rights only one ground need be proved, so long as that ground is proved by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

In addition to proving one of the grounds for termination, the petitioner must prove that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may only terminate a person's parental rights if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed de novo with *no presumption of correctness*. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (no Tenn. R. App. P. 11 application filed) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

## II. GROUNDS FOR TERMINATION

The trial court terminated Father's parental rights on two grounds. On appeal, Father contends that the evidence did not clearly and convincingly support either ground. We shall address each ground in turn.

### A.
### WILLFUL FAILURE TO SUPPORT THE BIOLOGICAL MOTHER BEFORE BIRTH

The trial court found there was clear and convincing evidence to terminate Father's parental rights on the ground of abandonment set forth at Tennessee Code Annotated § 36-1-102(1)(A)(iii) for willful failure "to make reasonable payments toward the support of the child's mother during the four (4) months immediately preceding the birth of the child."

The biological mother testified at trial that she had no healthcare expenses related to the child's pregnancy as she was on TennCare. Further, she testified that she never asked Father for any money or support during the pendency of the child's birth. She stated that this was due in part to her belief that he would be unwilling to provide such support. Father testified that he did not provide support to Mother for several reasons; foremost being that he was uncertain whether he was the biological father of the child and had maintained this concern from the beginning of the pregnancy. Father testified at trial that he engaged in a very brief sexual relationship with Mother that lasted approximately two months. Mother and Father did not see each other for long periods of time as Father traveled for work. Additionally, Father testified that he further believed Mother and he were not in an exclusive relationship based upon an incident where a boyfriend of Mother's showed up at her house on one occasion. While Mother maintained that she believed Father and she were in an exclusive relationship, she admitted that they only went on one date and she made two trips to visit Father. Father was not confirmed as the biological father of the child until six months after the child's birth, in March of 2011.

Father testified at trial that Mother's only request for support came at the beginning of the pregnancy when she requested his assistance in obtaining an abortion, and Father testified that he was reluctant to fund an abortion because he did not want Mother to terminate the pregnancy in case the child turned out to be his biological child. Further, Father stated he did not believe he was the father. He also stated he had concerns that Mother would use the money for drugs as he had witnessed her drug use. While this court does not condone the inaction of a potential father who fails to support a woman who may be the mother of his unborn child, we cannot ignore that "[t]he inexhaustible and ever-changing complications in human affairs are constantly presenting new questions and new conditions which the law must provide for," as was recently discussed in *Hodge v. Craig*, 382 S.W.3d 325, 346 (Tenn.

2012), and we believe the facts of that case are relevant to the issue of willfulness regarding Father's failure to support Mother before the child's birth.

In the case before us, an unmarried man is told by an unmarried woman with whom he recently had sexual relations that he is the father of her unborn child, yet the man is so skeptical, that he refuses to renew a relationship with the expectant mother and refuses to provide pre-natal support. In *Hodge*, the Tennessee Supreme Court dealt with a factual scenario where the expectant mother convinced the man with whom she had sexual relations that he was the father and he married her and supported the child for years, even after their divorce until learning by DNA testing that he was not the biological father. *Id*. at 330-331.

Prior to the child's birth in *Hodge*, the child's mother, Ms. Hodge, persuaded Mr. Craig that he was the only man who could possibly be the father, they married, and the couple raised the child in their household for nine years until they divorced. *Id*. at 330. The divorce decree incorporated a marital dissolution agreement that obligated Mr. Craig to pay monthly child support. *Id*. He timely paid child support until the trial court approved a modified parenting plan that designated him as the child's primary residential parent. *Id*. at 331. Thereafter, the mother began paying child support to him. *Id*. Subsequently, when DNA evidence revealed that Mr. Craig was not the biological father, Ms. Hodge filed a petition for sole custody of the child. *Id*. Thereafter, both parties acknowledged that Mr. Craig was not the child's biological father and the trial court granted mother custody, terminated child support, and reserved all other matters for later resolution. *Id*. at 332.

While the case was still pending, Mr. Craig filed a counter-petition against Ms. Hodge for "intentional or negligent misrepresentation," claiming that she knew or should have known that he was not the child's biological father. *Id*. Following a trial, the trial court found that the mother had purposely defrauded Mr. Craig, and ordered her to pay damages to Mr. Craig for the child support, medical expenses, and insurance premiums Mr. Craig had paid on behalf of the child. *Id*. The Court of Appeals reversed that decision. Thereafter, the Supreme Court affirmed in part and reversed in part the decision of the intermediate court. *Id*. at 348. In pertinent part the Supreme Court reversed the Court of Appeals' determinations "that Mr. Craig could not pursue a common-law intentional misrepresentation claim against Ms. Hodge based on her representations that he was [the child's] biological father and that no one else could be" and held that public policy did not prevent Mr. Craig from pursuing "a common-law damages claim" based on Ms. Hodge's intentional misrepresentations.[3] *Id*.

---

[3]In its conclusion the Supreme Court stated:

We affirm the determination of the Court of Appeals that Ms. Hodge intentionally

(continued...)

-7-

Like *Hodge*, the case before us presents complex legal and moral issues that arise out of disputed paternity actions where, as in this case, paternity was uncertain during two very relevant time frames that are at issue, and we recognize, as the Supreme Court did*,* that such cases implicate the interests of family, a putative biological father, the child, the prospective adoptive parents and the public policy of the State of Tennessee.[4] *Id*. at 338. This is because "[c]ases based on a mother's [representations or] misrepresentations regarding the identity of a child's biological father present difficult and intractable problems that are 'much more complicated than a bad girl, good guy scenario.'" *Id.* (footnote omitted). In *Hodge*, the Supreme Court discussed the complexities of this subject in the context of intentional misrepresentations from the perspective of a man who was deceived into believing he was the father of the unmarried woman's child:

> Those who oppose recognizing these claims insist that the courts' primary concerns should focus on the child and the family and that the putative father's interests should be secondary to those of "the state, the family, and the child in maintaining the continuity, financial support, and psychological security of an established parent-child relationship." Those who support these claims assert that there is "a fundamental sense that it is unfair to require a man to support a child with whom he has no biological connection." They also insist that there is a growing recognition that the courts should not force a man to support a child who is not his biological child unless he has been given an opportunity to make a voluntary choice to provide support despite his knowledge that he has no biological relationship with the child.

*Id*. at 338-39 (footnotes and internal citations omitted).

---

[3](...continued)
misrepresented [the child's] paternity to Mr. Craig. However, we reverse its determinations that Mr. Craig could not pursue a common-law intentional misrepresentation claim against Ms. Hodge based on her representations that he was [the child's] biological father and that no one else could be and that the judgment awarding Mr. Craig damages amounted to a retroactive modification of child support prohibited by Tenn. Code Ann. § 36-5-101(f)(1). However, because of the trial court's error in computing the amount of damages, we remand the case to the trial court with directions to amend its judgment to award Mr. Craig $25,244.44 in damages for the child support, medical expenses, and insurance premiums he paid following the divorce and for whatever other proceedings consistent with this opinion may be required.

*Hodge*, 382 S.W.3d at 348.

[4]We did not mention Mother in this discussion for she surrendered her parental rights.

The Court went on to provide a thorough review of the historical developments in this important area of law and society:

In 1949, the General Assembly placed significant restrictions on filing lawsuits for breach of a contract to marry. Forty years later, in 1989, the General Assembly repealed the common-law tort claim for alienation of affections. The following year, the General Assembly abolished the common-law claim for seduction or criminal conversation. During this same period, this Court totally abolished the common-law doctrine of inter-spousal immunity after determining that "[t]he legal abstraction of unity" of married spouses had become "an historical oddity rather than a functioning concept of law." *Davis v. Davis*, 657 S.W.2d 753, 759 (Tenn. 1983). In addition, both the General Assembly and this Court placed the legal onus on biological parents – both married and unmarried – to provide financial support to their children.

In 1997, the General Assembly replaced the legitimation and paternity statutes which had severely restricted a biological father's ability to obtain a judicial declaration to his parentage. The stated purpose of this Act was to create "a single cause of action to establish parentage of children" other than adoption proceedings or voluntary acknowledgment of parentage. Tenn. Code Ann. § 36-2-301. The Act also abolished "the [essentially conclusive] presumption that a child born to a married woman was the offspring of the woman's husband," *State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 176–77 (Tenn. Ct. App. 2000), and provided in Tenn. Code Ann. § 36-2-305(b)(1)(C) that any man claiming to be a child's father had standing to seek a judicial determination of his parentage. In 1999, after this Court narrowly construed the application of the 1997 Act, the General Assembly enacted Tenn. Code Ann. § 36–2–304(b)(2)(B) to express its "clear and unequivocal" intent that the new parentage statutes applied retroactively to parentage claims by biological fathers that had been dismissed prior to May 24, 1999, either for lack of standing or because of the now-repealed presumption arising from marital status of the child's mother. *State ex rel. Cihlar v. Crawford*, 39 S.W.3d at 178.

Two provisions in the 1997 Act and in a 1998 amendment to the Act reflect the General Assembly's awareness of the existence of actions to rebut or disestablish paternity and the possibility that a person found not to be a child's biological father could pursue a claim for damages against the child's biological parents. Tenn. Code Ann. § 36-2-304(b)(3), enacted in 1998, states that "[t]he standard of proof in an action to rebut paternity shall be by

-9-

preponderance of the evidence." Similarly, Tenn. Code Ann. § 36-2-309(b) states, in part, that "[n]othing in this subsection (b) shall preclude the issuance of a judgment against the mother or actual biological father of the child or children in favor of the person subsequently found not to be the father of the child or children."

*Hodge*, 382 S.W.3d 339-42 (footnotes omitted).

In addition to the evolution of the law of parentage, post-natal paternity testing is now a safe and readily available means of resolving the uncertainty of parentage; however, as *Hodge* reminds us, a woman's pre-natal assertion of parentage is not always reliable. Thus, if Father was justifiably suspicious of Mother's assertion that he was the child's father, he and Mother should have pursued the appropriate pre-natal testing, if available, provided pre-natal paternity testing is available and safe for mother and the unborn child. Unfortunately, this record provides no information whatsoever regarding the availability or safety of pre-natal paternity testing. Moreover, the record tells us that neither Mother nor Father requested pre-natal paternity testing. Although it is now common knowledge that post-natal paternity is both safe and readily available, whether pre-natal paternity testing is available or safe is not commonly known, thus, without evidence in the record, such testing, if safe or available for pre-natal purposes, does not qualify for our consideration under the evidentiary protocol of judicial notice. Accordingly, the record does not permit this court to consider this circumstance as favoring either party.

The trial court found that there was clear and convincing evidence to terminate Father's parental rights on the ground set forth at Tennessee Code Annotated § 36-1-102(1)(A)(iii) for willful failure "to make reasonable payments toward the support of the child's mother during the four (4) months immediately preceding the birth of the child." As noted above, clear and convincing evidence is evidence that "eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 860. The unique facts of this case, and just as important, the lack of facts that may have resolved the uncertainty, fail to eliminate serious or substantial doubt that Father *willfully* failed to make reasonable payments toward the support of the child's mother during the four months immediately preceding the birth of his child. Therefore, the petitioners have not established, by the requisite clear and convincing standard, that Father *willfully* failed to make reasonable payments toward the support of the child's mother during the four months immediately preceding the birth of the child as required by Tennessee Code Annotated § 36-1-102(1)(A)(iii). Accordingly, we reverse the trial court's finding on this ground and hold that it has not been established that Father *willfully* failed to support his child's mother preceding the child's birth by clear and convincing evidence.

B.

WILLFUL FAILURE TO SUPPORT FOR THE FOUR MONTHS PRECEDING THE PETITION

The trial court found a second ground for terminating Father's parental rights, the ground of abandonment set forth at Tennessee Code Annotated § 36-1-102(1)(A)(i) for willful failure to support or make reasonable payments toward the support of the child for the four consecutive months preceding the filing of the petition to terminate Father's parental rights.

For purposes of terminating parental rights of a parent, "abandonment" means:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).

The petition to terminate Father's parental rights was filed on April 8, 2011; thus, the applicable time period for this ground is December 8, 2010, to April 8, 2011. At all times during this period, the child was in the custody and care of the Guardians based upon a guardianship order. Father, however, never received notice of the application for a partial guardianship nor the order appointing the Guardians. Further, the Guardians testified that they knew Father had been identified as the potential biological father and Mother provided his phone number to the Guardians when they were appointed; in fact, the surrender documents contained Father's phone number and the address of Father's parents. The Guardians also knew they would have to provide notice to Father, either by contacting him directly or by publication, should they wish to adopt the child. The Guardians and their attorney, however, made no attempt to contact Father until January or February 2011 when they learned that he was making inquiries about the child.

Father did not become aware that the Guardians had custody of the child until some time in January 2011 when Father called Mother. Mother refused to inform Father of the Guardians' identity or their contact information; instead, she agreed to notify the Guardians that he wanted to contact them. Sometime thereafter, Father was contacted by the Guardians' attorney and they agreed for Father to take a paternity test. Father was notified in March 2011 that the test confirmed he was the biological father of the child, which was less than one month prior to Father filing his Rule 60 motion to set aside the order of partial guardianship

seeking to be named the guardian and to obtain custody of his child and the Guardians filing their petition to terminate his rights and to adopt the child.

Like the trial court, we too are troubled by Father's very tardy inquiries about the child, particularly realizing that safe paternity testing could have been done soon after the child's birth, which was on September 27, 2010, four months before his first inquiry. Furthermore, Father's tardiness is even more inexcusable for, as Father testified, Father believed that he and Mother had agreed, at some point during the pregnancy, to obtain a paternity test following the child's birth. Father, however, testified that he waited several months to contact Mother due to a situation he encountered when his older child was born. In that instance, Father testified that he fathered the child out of wedlock to a woman in Florida and, upon the child's birth, he immediately drove to Florida to visit the mother and his child. When he arrived, however, the mother and her family refused to let him see the child and his repeated efforts to see the child resulted in harassment charges being filed against him. The issue was resolved with pretrial diversion and Father testified that he now has a good relationship with that child. Nevertheless, Father testified that he was concerned of a similar situation arising and felt that he should give Mother time to adjust before he made further inquiries.

Although we are concerned with the cloak of secrecy surrounding the guardianship proceedings and the failure to notify Father of such proceedings, before or after the hearing, the record reflects that Father was gainfully employed during the four months preceding the filing of the petition to terminate his parental rights, he knew the child was expected to be born in the fall of 2010, he knew how to contact Mother at all times relevant to these proceedings, and he had the ability to financially support the child but failed to do so. Based upon these facts and that Father could have easily and promptly resolved any uncertainty concerning whether he was or was not the child's biological father soon after the birth, we agree with the trial court's finding that the Guardians proved by clear and convincing evidence that Father willfully failed to support or make reasonable payments toward the support of the child for the four consecutive months preceding the filing of the petition to terminate Father's parental rights. Thus, the Guardians have proven one ground for termination of Father's parental rights, that of Tennessee Code Annotated § 36-1-102(1)(A)(i).

Therefore, we affirm the trial court's conclusion that Father abandoned the child by willful failure to support during the four months preceding the filing of the petition to terminate Father's parental rights.

To terminate a parent's parental rights only one ground need be proved, so long as that ground is proved by clear and convincing evidence, and it is in the best interest of the child

to terminate the parent's parental rights. *See In re C.W.W.*, 37 S.W.3d at 476 (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, we shall consider the best interest of the child as is required by statute.

## III.
## BEST INTERESTS

Once a statutory ground for termination has been found, the trial court is to engage in a best interest analysis using the statutory factors set forth at Tennessee Code Annotated § 36-1-113(i)(1)-(9).

The Tennessee General Assembly has provided a list of factors for the court to consider when conducting a best interest of the child analysis. *See* Tenn. Code Ann. § 36-1-113(i)(1)-(9). The nine statutory factors, which are well known, are not exclusive or exhaustive, and other factors may be considered by the court. *See In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006); *see also In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Moreover, not every statutory factor need apply and a finding of but a few significant factors may be sufficient to justify a finding that termination of the parent-child relationship is in the child's best interest. *See In re M.A.R.*, 183 S.W.3d at 667. Further, the child's best interest is to be determined from the perspective of the child rather than the parent. *See State Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *7 (Tenn. Ct. App. Dec. 3, 2007) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

The factors listed under Tennessee Code Annotated § 36–1–113(i) are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances or controlled substances analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In this case, the trial court found only four factors relevant, the first, third, fourth and fifth factors, and concluded that these factors clearly and convincingly established it was in the child's best interest to terminate Father's parental rights. The trial court's findings are as follows:

As to the first factor, the testimony at trial showed that [Father] and his wife currently live in a one-bedroom house, but are renovating a four-bedroom house. According to [Father], the house should be ready very soon and within a very few months. [Father] also testified that his wife is a college student, and he drives a commercial truck. While [Father] may in fact have a suitable circumstance in the coming months, the Court is not persuaded that his living situation would be in the best interest of the child.

As to the third statutory factor, [the Guardians] and [Father] testified that no visitation has taken place between the child and [Father]. [Father]

-14-

submits that he has asked for visitation, and filed Rule 60 Motion to Set Aside the Partial Guardianship of the [the Guardians]. However, no visitation was ever effected or discussed before guardianship was awarded to [the Guardians]. [The Guardians] and [Mother] testified that the child has been with [the Guardians] since birth. [The Guardians] have been in continual contact with the child.

Further, as to the fourth factor, the record reflects that no meaningful relationship has been established between the child and [Father]. [Father] asserts that visitation was requested, but denied by [the Guardians]. However, the best interest analysis must be considered from the perspective of the child, not the parent. The child in question is now eighteen months old. The evidence presented through [the Guardians'] testimony is that the child has developed meaningful relationships in the home. [Father] has never been physically present with the child. The Court finds this lack of relationship to be significant in determining what placement is in the child's best interest.

The fifth and final relevant factor, is also very significant in this case. According to [the Guardians'] testimony, the child is well adjusted in their home. The child has only known [the Guardians] as parents from birth. [Mrs. H] also testified that the child has a good relationship with [the Guardians'] son. There was little testimony from [Father] regarding how the change of circumstances would impact the child. [Father] testified generally that he felt the child would be fine, and would, due to her young age, adjust without problems. However, he also testified that he did have concern about the impact of those changes. While there was no psychologists (sic) testimony presented, it appears likely to the Court that such a drastic change in atmosphere, location, and relationships would have a detrimental effect on the child. Based on the evidence presented, this factor preponderates in favor of the child remaining in the care of [the Guardians].

After considering each of these relevant statutory factors, the Court finds that the best interest of the child is to remain in the home of [the Guardians]. There is no dispute that [the Guardians] have provided complete care and support of the child since birth. The testimony indicates that the home is safe, and if there is a potential move, there will be similar housing provided. There is also the likely issue of detrimental effects to the child's psychological and medical conditions. The child has been hospitalized on one occasion, and [the Guardians] were involved in her care throughout the illness. The time Madilene has spent with [the Guardians] is sufficient to create meaningful

bond that this Court is loathe to break. From the evidence presented, it is clear to this Court that it is in the child's best interest to remain in her current situation with [the Guardians].

We shall address the above findings by the trial court but first we must state that we respectfully disagree with the trial court's limitation of the relevant factors to the four identified immediately above. Therefore, we shall discuss the additional factors we believe relevant in addition to the four identified by the trial court in order to reach our own conclusion as to whether the Guardians proved by clear and convincing evidence that it is in the child's best interest to terminate Father's parental rights. *See In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed de novo with *no presumption of correctness. Id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

As for the first factor, which pertains to whether the parent has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent, we find the facts preponderate against the trial court's finding. First, we find the change of circumstance factor is not relevant to the fact that Father and his wife were living in a one-bedroom house at the time of the hearing. Moreover, they testified that they had purchased and were remodeling a four bedroom house, which the trial court failed to consider.

The second factor, which was not addressed by the trial court, is whether the parent has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. Although social services agencies were not involved, there is nothing in this record to suggest that Father needs to make any adjustments other than the one he made, and that is attempting to be a positive presence in his child's life.

As for the third factor, whether the parent has maintained regular visitation or other contact with the child, the trial court is correct that Father has never visited the child, but we find this adverse ruling perplexing for it was the Guardians and the trial court who refused to allow Father to have any visitation whatsoever at anytime. Admittedly, Father did not seek to visit with the child before January 2011; however, when he called Mother about the child she only told him that she no longer had custody and refused to tell him who did or how to contact them. Moreover, she and the Guardians knew how to contact Father yet they intentionally kept the guardianship and the child's location secret. Father first attempted to visit the child when he called Mother in January, when the child was only four months old; yet, Father had to wait until the Guardians' attorney contacted him in either January or

February of 2011, at which time Father agreed to take a paternity test but he was still refused visitation. Once his parentage was determined in March of 2011, when the child was only six months old, Father again attempted to visit the child only to be refused any form of visitation. In April of 2011, within one month of learning that he was the father, he filed a Rule 60 motion to set aside the guardianship and additionally requested the court to order the Guardians to permit visitation. Once again, however, his efforts to visit the child were opposed by the Guardians and his motion for visitation was denied by the trial court. The child was only seven months old at the time. The record also reveals that Father made other attempts to obtain court-ordered visitation only to be denied each time. Furthermore, Father was not even permitted to have supervised visitation in spite of the fact there was no evidence that Father had a mental or emotional status that would be detrimental to the child, there was no evidence the physical environment of Father's home was not healthy or safe, there was no evidence of criminal activity in his home, and there was no evidence of abuse of alcohol or use of controlled substances as may render Father unable to care for the child in a safe and stable manner. All of these factors are to be considered when parental visitation is at issue and yet, even though it was stipulated that Father was the child's father, he was never permitted to have any contact of any kind at any time with his child.

Furthermore, we respectfully submit that the trial court placed too much emphasis on the fact that Father had not arranged visitation prior to the award of guardianship to the Guardians; we also note the trial court repeatedly referred to this fact in its best interest findings as they pertained to the lack of visitation. We find the trial court's repeated emphasis on this fact misplaced because the guardianship proceedings occurred when the child was one month old and Father was not notified of the guardianship proceedings and he was not served with the order of partial guardianship. We also find this problematic because Mother, the Guardians and the court knew Father had been identified as the potential biological father and the surrender documents in the guardianship proceeding contained Father's phone number and the address of Father's parents yet no one notified Father of the proceedings. The record readily reveals that a cloak of secrecy was cast over the guardianship proceeding by Mother and the Guardians and yet this secret proceeding is being used by the Guardians to establish that it is in the child's best interest to terminate Father's parental rights because he did not visit the child prior to the creation of the guardianship.

Ever since the order of guardianship was entered, Father's repeated attempts to visit the child were denied by the trial court upon the Guardians' repeated objections and yet, the fact Father did not arrange visitation prior to the guardianship, when the child was only one month old, is the alpha and omega upon which the trial court's best interests conclusion is based. This is evident from the fact the three remaining best interest factors are based upon the fact that Father has never been physically present with the child, that no meaningful relationship has been established between Father and the child, that the child is well-adjusted

in the Guardians' home, and the child has only known the Guardians as parents. Each of these findings by the trial court are correct, but that is because, in spite of Father's repeated attempts, he has always been denied any form of visitation.

The sixth, seventh, eighth, and ninth factors, which were not addressed by the trial court, are addressed immediately below.

The sixth factor is whether the parent, or other person residing with the parent, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household. There is no evidence that Father, his wife, or anyone else in their household has done any of these things.

The seventh factor is whether the physical environment of the parent's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances or controlled substances analogues as may render the parent consistently unable to care for the child in a safe and stable manner. Once again, there is no evidence of any such activity.

The eighth factor is whether the parent's mental or emotional status would be detrimental to the child or prevent the parent from effectively providing safe and stable care and supervision for the child. No one has questioned Father's mental or emotional health and Father's testimony at trial and that of the other witnesses reveal no cause for concern whatsoever.

The ninth factor is whether the parent has paid child support consistent with the child support guidelines promulgated by the department pursuant to Tennessee Code Annotated § 36-5-101.

We have considered the relevant factors and, as we reach our conclusion concerning whether the evidence clearly and convincingly establishes that it is in the child's best interest to terminate Father's parental rights, it is important that we recognize that "[n]o civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Audrey S.*, 182 S.W.3d at 860. Nevertheless, parental rights may be terminated where a statutorily defined ground and the child's best interest have each been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Audrey S.*, 182 S.W.3d at 860; see also *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child).

The heavy burden of proving by clear and convincing evidence that termination is in the child's best interests falls upon the persons seeking to terminate the parent's rights. *See* Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. That evidentiary burden requires the persons seeking to terminate a parent's rights to introduce evidence that "establishes that the truth of the facts asserted is highly probable. . . , and *eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence*." *In re Audrey S.*, 182 S.W.3d at 860 (internal citations omitted) (emphasis added).

Realizing the gravity of our decision as it concerns the child's best interest, and considering the termination of Father's parental rights from the child's perspective, the evidence concerning the child's best interest does not eliminate serious or substantial doubt about the correctness of the trial court's conclusions drawn from the evidence. *In re Audrey S.*, 182 S.W.3d at 860. Accordingly, the evidence does not clearly and convincingly establish that it is in the child's best interest to terminate Father's parental rights.

Because the evidence does not clearly and convincingly establish that it is in the child's best interest to terminate Father's parental rights, we reverse the judgment of the trial court terminating his parental rights and remand with instructions to enter judgment dismissing the Guardians' petition to terminate Father's parental rights and for adoption.

IV.
FATHER AND STEP-MOTHER'S PETITIONS

On the same day the Guardians filed their petition to terminate Father's parental rights and to adopt the child, Father and his wife filed a petition for custody and step-parent adoption. On February 13, 2012, the trial court issued a Memorandum Opinion denying the petition filed by Father and his wife for custody and step-parent adoption and granting the petition filed by the Guardians to terminate Father's parental rights and adopt the child. The trial court gave no reasons or basis for dismissing Father and Step-Mother's petition for custody and counter-petition for step-parent adoption other than the fact that the court terminated Father's parental rights. As we have reversed the decision terminating Father's parental rights and an order was entered establishing his parentage, which we also affirm, we reverse the dismissal of Father and Step-Mother's petition and counter-petition, reinstate Father and Step-Mother's petition and counter-petition, and remand these issues to the trial court for further proceedings.

It does not appear that Father appealed the denial of his Rule 60 motion to set aside the partial guardianship; therefore, we make no ruling on that motion and order. We acknowledge that the order of partial guardianship remains in effect, our decision in this matter notwithstanding.

## In Conclusion

In conclusion, we affirm the order in which the parties stipulated, based upon DNA testing, that Father is the biological father of the child. We reverse the judgment of the trial court terminating Father's parental rights, we reverse the trial court's dismissal of Father and Step-Mother's petition for custody and counter-petition for step-parent adoption, and we remand this action to the trial court for consideration of Father and Step-Mother's petition and counter-petition and for other proceedings consistent with this opinion. Costs of appeal are assessed against the Appellees.

_____
FRANK G. CLEMENT, JR., JUDGE